**Suzanne MONTGOMERY,
et al., Plaintiffs,**

v.

**Harold CARR, et al., Defendants.**

No. C–1–93–562.

United States District Court,
S.D. Ohio, W.D.

Aug. 31, 1993.

Frederick Mason Morgan, Jr., Cincinnati, OH, for Suzanne Montgomery and Charles G. Montgomery.

Edward Earls Santen, David Michael Kothman, Santen & Hughes—1, Cincinnati, OH, for Harold L. Carr and Board of Educ. Grat Oaks Institute of Technology and Career Development.

## ORDER

HERMAN J. WEBBER, District Judge.

Plaintiffs Suzanne Montgomery and her husband Charles Montgomery bring this action through counsel under 42 U.S.C. § 1983 alleging that defendants violated their First Amendment right to freedom of association. Defendants are Dr. Harold Carr, the Chief Executive Officer of the Great Oaks Institute of Technology and Career Development (Great Oaks), and the Great Oaks Board of Education.

This matter is before the Court upon plaintiffs' motion for a preliminary injunction (doc. no. 2), defendants' response (doc. no. 8), defendants' motion to dismiss (doc. no. 5), defendants' motion for an expedited hearing on the motion to dismiss (doc. no. 6), and plaintiffs' response (doc. no. 7). This Court held an evidentiary hearing on plaintiffs' motion for preliminary injunction on August 25, 1993.

## I.

Great Oaks is a multi-campus system of secondary education whose mission includes providing vocational, developmental, and educational resources to children, adults, and businesses in southwest Ohio. Great Oaks consist of numerous campuses located in different areas of southwest Ohio including the Scarlet Oaks Career Development Campus in Sharonville, Ohio (Scarlet Oaks), and the Live Oaks Career Development Campus in Milford, Ohio (Live Oaks).

Great Oaks has an unwritten policy against spouses working at the same campus. The parties refer to the policy as an "anti-nepotism" policy. A Great Oaks policy manual contains an anti-nepotism policy which the parties seem to agree does not apply to this case but instead applies only to supervisors or administrative personnel. The parties do not dispute the existence of the unwritten anti-nepotism policy, which is challenged by plaintiffs in this case (the anti-nepotism policy). Defendant Carr testified that the anti-nepotism policy was first implemented in 1970 by the original Superintendent of Great Oaks. When Carr became Chief Executive Officer [1] in 1975 he continued the policy.

Plaintiff Suzanne Montgomery has been employed by Great Oaks as a teacher at the Scarlet Oaks campus since 1984. Plaintiff Charles Montgomery has been employed by Great Oaks as a teacher since 1974 and has taught at the Scarlet Oaks campus since 1984. Plaintiffs married each other on June 18, 1992, and presently reside in Maineville, Ohio. Prior to their marriage plaintiffs had lived together for two years.

Plaintiffs decided to conceal their marriage from defendants. They admit that they submitted an insurance form to the Great Oaks Human Resources office containing an erroneous date of marriage. Mrs. Montgomery intentionally placed the erroneous date on the form, after Mr. Montgomery advised her to do so, because they knew about the anti-nepotism policy, and because they feared one of them would be transferred from Scarlet

Oaks if defendants learned about their marriage.

In December 1992, Great Oaks Vice President of Human Resources Sharon Lowery learned of plaintiffs' marriage. Lowery did not know plaintiffs had been living together. She discussed the marriage and Great Oaks' anti-nepotism policy with Dr. Carr and recommended that plaintiffs be allowed to remain at Scarlet Oaks for the remainder of the school year in order to avoid disrupting the students or the educational process. She also recommended transferring one of plaintiffs to another campus. Dr. Carr agreed with these recommendations.

Lowery next approached Scarlet Oaks Principal Timothy Hunter and asked him to discuss the matter with plaintiffs. Hunter testified that in late December 1992 or early January 1993 he met with plaintiffs and informed them that one of them would be transferred at the end of the 1992–93 school year pursuant to the anti-nepotism policy. Charles Montgomery recalls that Hunter told them that one of them "might" be transferred.

Plaintiffs taught at Scarlet Oaks for the remainder of the 1992–93 school year. Both received positive evaluations and neither received notice of any particular problems that their marriage was causing at Scarlet Oaks. Mary Ellen Steinhauer, a Curriculum Support Specialist, testified that she observed Mr. Montgomery in Mrs. Montgomery's lab many times, particularly towards the end of the school year. According to Steinhauer, certain teachers were having difficulty meeting with Mrs. Montgomery because of the lack of time. Steinhauer attributes the lack of time in part to the increase in visits between plaintiffs during the school day. Steinhauer never brought this concern to Mrs. Montgomery's attention. Principal Hunter—plaintiffs' ultimate supervisor—was never aware of any problem caused by plaintiffs' marriage.

On July 13, 1993, Lowery telephoned Suzanne Montgomery and informed her that the decision had been made to transfer her to

1. The Great Oaks Board recently adopted the term "Chief Executive Officer" in place of the term "Superintendent".

Live Oaks pursuant to the policy against spouses working on the same campus. Mrs. Montgomery will assume the same teaching position at Live Oaks as she held at Scarlet Oaks. The transfer is purely lateral: Mrs. Montgomery's pay, benefits, and job description have not changed. She will instruct approximately 200 students at Live Oaks as opposed to approximately 600 students at Scarlet Oaks. The Computer Aided Instructor at Live Oaks will assume Mrs. Montgomery's position at Scarlet Oaks. Mrs. Montgomery will need to drive approximately thirteen more miles per day to work at Live Oaks. This will increase plaintiffs' driving expenses approximately $2,000.00 per year.

Mrs. Montgomery acknowledges that the only students affected by her transfer will be certain senior-level "GED" students whom she instructed during the 1992–93 school year and who were scheduled to return for further work with her during the upcoming school year.

Mrs. Montgomery testified that she has been "very upset" and on an "emotional roller coaster" since learning of her transfer. She cries often, experiences sleepless nights and loss of appetite. She feels she is being punished for being married, and she is apparently anxious about beginning to teach at Live Oaks. According to both plaintiffs, it takes three to five years to adjust to a new teaching position at Great Oaks. Dr. Carr testified that the adjustment period is less than 3–5 years.

Defendants do not challenge either Mrs. Montgomery's ability or professionalism as an educator. Lowery described Mrs. Montgomery as an "excellent" teacher.

## II.

■ Plaintiffs claim that the anti-nepotism policy violates their rights under the First Amendment to freedom of association. Defendants contend that plaintiffs have failed to state a cause of action upon which relief can be granted because as a matter of law Mrs. Montgomery's transfer was not an "undue intrusion" into plaintiffs' marriage and because the unwritten anti-nepotism policy has a rational basis and is therefore constitutional.

■ In determining a motion to dismiss for failure to state a claim, the allegations in the complaint must be taken as true and construed in the light most favorable to the nonmoving party. *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir.1976). The motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 44–45, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *see Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

■ Defendants' motion to dismiss lacks merit since plaintiffs allege that the decision to transfer Mrs. Montgomery was based solely on her marital status. In the absence of some justification by the State, this intrusion into plaintiffs' marital relationship is prohibited under the First Amendment, *see Adkins v. Board of Education of Magoffin County, Ky.*, 982 F.2d 952, 955–57 (6th Cir. 1993), and implicates the liberty component of the Due Process Clause of the Fourteenth Amendment, *see Littlejohn v. Rose*, 768 F.2d 765, 768–70 (6th Cir.1985), *cert. denied*, 475 U.S. 1045, 106 S.Ct. 1260, 89 L.Ed.2d 570 (1986). Defendants' efforts to show the existence of a rational basis for the unwritten anti-nepotism policy are not properly the subject of a motion to dismiss since in this case the Court must look beyond the pleadings to resolve these contentions. Additionally, defendants argue that plaintiffs have committed laches because they waited until August 1993 to file this suit. The merits of this affirmative defense cannot be determined without weighing the evidence, and therefore laches cannot be proven at this time.

Accordingly, defendants' motion to dismiss lacks merit.

## III.

Plaintiffs seek a preliminary injunction preventing defendants from transferring Mrs. Montgomery to Live Oaks.

"[T]he purpose of a preliminary injunction, in contrast to one that is final, 'is merely to

preserve the relative positions of the parties until a trial on the merits can be held.' " *Southern Milk Sales, Inc. v. Martin,* 924 F.2d 98, 102 (6th Cir.1991) (quoting *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981)).

To determine whether to issue or withhold a preliminary injunction, this Court must balance the following factors:

(1) Whether the party seeking the injunction has shown a substantial likelihood of success on the merits;

(2) Whether the party seeking the injunction will suffer irreparable harm absent the injunction;

(3) Whether an injunction will cause others to suffer substantial harm; and

(4) Whether the public interest would be served by a preliminary injunction.

*Southern Milk Sales, Inc.,* 924 F.2d at 103 n. 3; *Newsom v. Norris,* 888 F.2d 371, 373 (6th Cir.1989); *Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1263 (6th Cir. 1985).

■ A party must show more than a mere possibility of success to obtain a preliminary injunction. *Michigan Coalition v. Griepentrog,* 945 F.2d 150, 153 (6th Cir.1991). In general, the extent a party must demonstrate a substantial likelihood of success varies inversely with the degree of harm the party will suffer absent an injunction. *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 538 (6th Cir.1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979). Issuance of a preliminary injunction is appropriate "where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to defendant if an injunction is issued." *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985) (citation omitted).

■ Although no single factor is determinative of the availability of a preliminary injunction, *In re DeLorean,* 755 F.2d at 1229, a failure to demonstrate the existence of an irreparable injury absent a preliminary injunction can be fatal to a motion for preliminary injunction. *See, e.g., Southern Milk Sales, Inc.,* 924 F.2d at 103. Monetary or economic harm by themselves do not constitute irreparable harm. *State of Ohio ex rel. Celebrezze v. N.C.R.,* 812 F.2d 288, 290 (6th Cir.1987).

■ At the preliminary injunction stage, a district court is not required to resolve "doubtful or difficult questions of law or disputed questions of fact." *International Molders' and Allied Workers' Local U. v. Nelson,* 799 F.2d 547, 551 (9th Cir.1986).

### A.

■ Plaintiffs contend that they have demonstrated a substantial likelihood of success on the merits of their First Amendment claim since defendants' anti-nepotism policy and the decision to transfer Mrs. Montgomery pursuant to the anti-nepotism policy interferes with plaintiffs' right and freedom to marry. Plaintiffs rely primarily on *Adkins,* 982 F.2d 952, and *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

Defendants argue that three critical problems bar plaintiff from being able to show a substantial likelihood of success on the merits. "First, not one federal case ... has ever invalidated a no spouse policy of any school or governmental agency. Second, constitutional rights are rarely absolute rights; they are inevitably balanced against competing governmental interests. Here, a compelling state interest in an orderly and efficient educational system allows the minimal intrusion on [plaintiffs'] marital relationship ... Time and again federal courts have upheld 'no spouse' policies where those policies served legitimate state interests. Third, plaintiffs outright lied to and concealed their marriage from defendants, then delayed for at least nine months ..., before filing this suit from the time they became aware of the policy. Therefore, the equitable defenses of unclean hands and laches precludes plaintiffs from invoking the assistance of equity." (doc. no. 8, p. 4).

■ Plaintiffs have not shown a substantial likelihood of success on the merits of

their First Amendment claim even though it is undisputed that defendants transferred Mrs. Montgomery because of her marital status. As previously determined, *supra,* p. 774, plaintiffs' allegations state a violation of her right to freedom of association embodied in the First Amendment. *Adkins,* 982 F.2d at 956. The First Amendment protects "intimate human relationships" from "undue intrusion" by the State. *Id.* Recognizing this, however, does little towards satisfying plaintiffs' burden at the preliminary injunction stage to demonstrate a substantial likelihood of success on the merits of their First Amendment claim. *Southern Milk Sales, Inc.,* 924 F.2d at 103 n. 3. Plaintiffs have not met their burden because of several weaknesses in their case.

Plaintiffs have not pointed the Court to a case holding that an anti-nepotism policy, such as defendants', violates the First Amendment, or that a decision to *transfer* a public employee based on an anti-nepotism policy is constitutionally impermissible. *Adkins* involved a decision to discharge a public employee rather than a decision to transfer. 982 F.2d at 955–56. Although there exists a possibility plaintiffs may ultimately show that the decision constituted an "undue intrusion" by the State into their First Amendment rights—particularly since defendants admit the transfer was based solely on Mrs. Montgomery's marital status—plaintiffs have not established a substantial likelihood of success in showing that the transfer constituted an "undue intrusion" into their marriage. This is so because defendants presented evidence tending to show that the transfer was in the best interests of the educational goals of Great Oaks based on Dr. Carr's need to prevent problems from occurring, rather than waiting until they arise to address them. Defendants presented testimony indicating that the anti-nepotism policy prevents such potential problems as disruption of staff "collegiality", the lessening of productivity of spouses who work together, and the disruption of the educational program when spouses separate or divorce. Although some of

these problems may be less serious or even non-existent in plaintiffs' case, the Court finds that defendants' identification of these problems may provide a sufficient basis for finding that defendants' anti-nepotism policy and their decision to transfer Mrs. Montgomery was not an "undue intrusion" into plaintiffs' First Amendment right to free association.[2]

The evidence also shows that Mrs. Montgomery's transfer did not deprive her of continued employment with Great Oaks since her new position at Live Oaks is within the Great Oaks system, and since the transfer was purely lateral: her pay, benefits, working hours, and job description remain the same.

Another weakness in plaintiffs' case exists in that the decision to transfer Mrs. Montgomery rather than Mr. Montgomery was based on a well-reasoned analysis by Sharon Lowery, Great Oaks Vice President of Human Resources. Lowery testified that she considered transferring either plaintiff to another campus. She first looked unsuccessfully for a position within Great Oaks for either plaintiff which would become open at the end of the 1992–93 school year due to a resignation or other natural attrition. Since none was available she considered transferring Mrs. Montgomery to the Diamond Oaks campus, but did not because her ex-husband holds a teaching position there. Lowery considered transferring Mr. Montgomery to Live Oaks but did not because he had taught at Live Oaks prior to 1984 and had experienced "some problems" there. Lowery therefore adopted the remaining option—to transfer Mrs. Montgomery to Live Oaks. This reasoning by Lowery shows no indication of a constitutional infirmity in the decision to transfer Mrs. Montgomery rather than Mr. Montgomery.

The Court lastly notes that Mrs. Montgomery possesses no property right protected by the Fourteenth Amendment to teach at a particular location of her choosing within Great Oaks. The parties agree that Dr. Carr

---

2. The Court intends no indication of its opinion on the wisdom—or lack thereof—of defendants' unwritten anti-nepotism policy and intends no indication of its opinion on the ultimate merits of plaintiffs' First Amendment claim or upon the issues which will likely arise at the summary judgment stage of this action.

has the authority to assign teachers to any Great Oaks campus.

Accordingly, plaintiffs have at most shown only the possibility of success on the merits of their First Amendment claim and have not shown a substantial likelihood of success on the merits of their claim.

**B.**

█ Plaintiffs contend that irreparable harm will occur if Mrs. Montgomery is transferred because the presence of a violation of their First Amendment rights constitutes irreparable harm. Plaintiffs argue that Mrs. Montgomery will suffer irreparable harm by defendants' act of forcing her "to uproot her longstanding workplace and move belongings, books, *etc.* She will lose the benefits of professional and personal work relationships built up over the years, as well as the ability to commute to work with her husband in one car. She will have to drive herself a greater distance to work than is the case now, and she will have to become accustomed to a new workplace, curriculum, and faculty." (doc. no. 2, p. 6).

█ To analyze whether plaintiffs have shown they will suffer irreparable harm absent a preliminary injunction, the focal point is the term "irreparable." *Griepentrog*, 945 F.2d at 154.

Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of stay[3], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974)). "[T]he harm alleged must be both certain and immediate, rather than speculative or theoretical." *Id.* Each party must produce "some evidence" of both a past injury and the likelihood of future injury in order to support their claim of irreparable harm. *Id.*

Plaintiffs have not shown that Mrs. Montgomery's transfer to Live Oaks will cause them irreparable harm. Their reliance on the existence of a violation of their First Amendment rights is premature since they have yet to establish such a violation and since they have not established a substantial likelihood of success of proving such a violation. *Supra,* pp. 775–777. The transfer, moreover, of Mrs. Montgomery from one campus to another within the Great Oaks system contains no indication of harm since Mrs. Montgomery did not lose any pay or benefits and since she will assume an identical position at Live Oaks. The loss of working relationships is not an irreparable injury even though it is distressing to Mrs. Montgomery, since she has succeeded in the past in building effective working relationships with students and teachers, and since there is no indication in the record that Mrs. Montgomery—an experienced and successful professional educator—will be hampered in any way from doing so at Live Oaks. Indeed, Lowery testified that Mrs. Montgomery is an "excellent" teacher.

█ The additional financial burden that plaintiffs will incur due to the increase in driving expenses does not constitute irreparable harm since financial losses are readily compensable in damages at law and since monetary harm is not generally the type of irreparable harm which warrants a preliminary injunction. *See State of Ohio v. NRC,* 812 F.2d 288 at 290–91 (6th Cir.1987).

Accordingly, plaintiffs have not demonstrated an irreparable injury.

**C.**

█ Plaintiffs contend that issuing a preliminary injunction "will not significantly impose on defendants' efficient dispatch of their duties." (doc. no. 2, p. 6). This is particularly so, according to plaintiffs, since there will be less disruption of the educational process by leaving Mrs. Montgomery at Scarlet Oaks. Plaintiffs emphasize that no third parties will be injured by a preliminary injunc-

3. This reference to a "stay," rather than a preliminary injunction, has no impact on the validity of this definition of "irreparable harm" since the factors are the same for determining whether an injunction or a stay should issue. *Griepentrog,* 945 F.2d at 153, 155.

tion and that there exists a strong public policy in favor of issuing a preliminary injunction because plaintiffs are so clearly likely to prevail on the merits and because the public interest is served by forcing public servants to act in a constitutional manner.

Dr. Carr testified that issuing a preliminary injunction in this case would cause "chaos" at Great Oaks, even though he cannot predict whether plaintiffs' marriage will cause problems at Live Oaks. A preliminary injunction would, according to Dr. Carr, prevent him from managing the educational program at Great Oaks since it would encourage others to challenge his policies. Dr. Carr claims that the unwritten anti-nepotism policy and his application of it to plaintiffs are merely safeguards by which he hopes to avoid problems or harm to Great Oaks' educational goals.

■■■■ The Court must consider whether issuing a preliminary injunction would harm the party enjoined or others, and if so, whether such harm outweighs the irreparable harm established by the party seeking the injunction. *In re DeLorean Motor Co.,* 755 F.2d at 1229. The Court must also consider the impact an injunction will have on the public. Where an injunction will spell public ruin or disaster, the Court may refuse to issue it, even where a strong showing has been made on the other factors. *Worthington Foods, Inc. v. Kellogg Co.,* 732 F.Supp. 1417, 1463 (S.D.Ohio 1990).

The Court finds that issuing a preliminary injunction will not significantly harm defendants. Despite Dr. Carr's dire predictions, he failed to testify to any identifiable harm to Great Oaks' educational programs which will likely flow from a preliminary injunction. This lack of harm to defendants, however, does little to assist plaintiffs since they have not demonstrated an irreparable injury in the absence of a preliminary injunction.

■■■■ The Court acknowledges that courts have determined in some cases that the public has a strong interest in the prevention of a violation of the First Amendment. *E.g., Americans United for Separation of Church and State v. City of Grand Rapids,* 784 F.Supp. 403 (W.D.Mich.1990), *rev'd. on other grounds,* 980 F.2d 1538 (1992). The instant case is distinguished from those cases since the only public concern implicated here is the educational welfare and goals of the Great Oaks students, which will not be impaired in the absence of a preliminary injunction. In addition, given the availability of a remedy at law if plaintiffs prevail, the public interest in preventing First Amendment violations like the one alleged here may be vindicated at trial.

Accordingly, the remaining factors do not favor issuing a preliminary injunction.

**D.**

Balancing the four preliminary injunction factors, this Court concludes that plaintiffs are not entitled to a preliminary injunction. The lack of irreparable harm and the less than substantial likelihood of success on the merits of their First Amendment claim weigh heavily against issuing a preliminary injunction. None of the remaining factors override these factors in this case. This Court finds no compelling need at this time for ordering defendants to reverse their decision to transfer Mrs. Montgomery and to allow her to teach at the Scarlet Oaks. Plaintiffs have legal remedies available which will afford them adequate relief in the event they prevail.

Accordingly, plaintiffs' motion for a preliminary injunction lacks merit.

**E.**

■■■ One concern not addressed by the parties is the need to maintain the status quo in this case. The status quo at the time the complaint was filed on August 12, 1993, was that Mrs. Montgomery had been transferred to Live Oaks. This is so because it is undisputed that defendants notified Mrs. Montgomery in July 1993 that they had decided to transfer her to Live Oaks. Although plaintiffs seek a preliminary injunction preventing defendants from effecting the transfer, they are in effect asking this Court to impose a mandatory preliminary injunction by reversing defendants' decision and ordering them to return Mrs. Montgomery to Scarlet Oaks pending the outcome of the litigation.

This Court recognizes that at the preliminary-injunction stage it has the power to compel defendants to "correct injury already inflicted by defining the status quo as the last peaceable uncontested status that existed before the dispute arose." *Massachusetts Mut. v. Associated Dry Goods*, 786 F.Supp. 1403, 1427 (N.D.Ind.1992). The term "status quo", however, must serve the primary purpose of preliminary injunction: to preserve the parties' relative positions in order to prevent irreparable injury prior to trial. *Southern Milk Sales, Inc.*, 924 F.2d at 101; *Cordis Corp. v. Medtronic, Inc.*, 835 F.2d 859, 863 (Fed.Cir.1987). Consequently, the focus of an inquiry into the status quo is upon the injury defendants allegedly caused plaintiffs. *See Canal Authority of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974).

The last peaceable uncontested status in this case is, of course, the position held by Mrs. Montgomery at Scarlet Oaks prior to her transfer. Yet, since plaintiffs have failed to demonstrate irreparable injury, there is no basis for requiring defendants to reverse Mrs. Montgomery's transfer at this point in the litigation. In addition, in order to obtain a mandatory injunction which would require defendants to reverse the decision to transfer Mrs. Montgomery, the facts and law must clearly favor plaintiffs' position. *See Committee of Cent. American Refugees v. I.N.S.*, 795 F.2d 1434, 1441 (9th Cir.1986), *amended* 807 F.2d 769 (1987). Since the facts and law do not clearly support plaintiffs' position, there is no need to alter the parties' relative positions at this point in the case. Mandatory injunctive relief is available if plaintiffs prevail at trial. Any injury plaintiffs may suffer in the interim is compensable in damages at law.

Accordingly, plaintiffs have not shown the need to alter the status quo in this case.

### F.

Defendants contend that since plaintiff attempted to conceal their marriage from defendants, the doctrine of unclean hands bars plaintiffs from obtaining equitable relief.

The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the opposing party." *Cleveland Newspaper Guild v. Plain Dealer Pub. Co.*, 839 F.2d 1147, 1155 (6th Cir.), *cert. denied*, 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 234 (1988) (quoting *Precision Inst. Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945)). Plaintiffs do not deny that they attempted to conceal their marriage from defendants and that they provided defendants with an insurance form containing a false date of marriage. Under these circumstances there is a likelihood the doctrine of unclean hands may bar plaintiffs from obtaining equitable relief. Plaintiffs simply did not deal squarely with defendants until their marriage became known to defendants. The Court notes that plaintiffs could have challenged defendants' unwritten anti-nepotism policy by filing a declaratory judgment action under 28 U.S.C. § 2201 either prior to or immediately after their marriage, rather than attempting to conceal their marriage. The likelihood of success on this affirmative defense by the defendants is a further reason to deny plaintiffs' request for a preliminary injunction.

### ORDER

The Court hereby **ORDERS** that:

(1) Plaintiffs' motion for a preliminary injunction (doc. no. 2) is **DENIED;**

(2) Defendants' motion to dismiss (doc. no. 5) is **DENIED;** and,

(3) Defendants' motion for an expedited hearing on their motion to dismiss (doc. no. 6) is **DENIED** as moot.

**IT IS SO ORDERED.**