101 F.3d 1117
 65 USLW 2412, 114 Ed. Law Rep. 750,
12 IER Cases 460
 Suzanne MONTGOMERY and Charles G. Montgomery, Plaintiffs-Appellants,
v.
Harold L. CARR, in his official capacity as President and
Chief Executive Officer of the Great Oaks Institute of
Technology and Career Development; Board of Education,
Great Oaks Institute of Technology and Career Development,
Defendants-Appellees.
 No. 94-4289.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 9, 1996.
Decided Dec. 4, 1996.
 
 Frederick M. Morgan, Jr. (argued and briefed), Helmer, Lugbill, Martins & Neff, Cincinnati, OH, for Plaintiffs-Appellants.
 David M. Kothman (argued and briefed), Edward Earls Santen (briefed), Santen & Hughes, Cincinnati, OH, for Defendants-Appellees.
 Before: MERRITT and BOGGS, Circuit Judges; and O'MEARA, District Judge.*
 BOGGS, Circuit Judge.
 
 
 1
 In this case brought under 42 U.S.C. § 1983, we settle an issue left open in Wright v. MetroHealth Med. Ctr., 58 F.3d 1130, 1134 n. 3 (6th Cir.1995)--the appropriate level of scrutiny to be applied to an alleged First Amendment associational rights violation caused by a governmental anti-nepotism policy. The plaintiffs, Suzanne and Charles G. Montgomery, are married teachers who work in the same public vocational school district. The anti-nepotism policy in this case caused Suzanne Montgomery to transfer to another school in the same system. We hold that rational basis scrutiny applies to the governmental policy involved and affirm the district court's grant of summary judgment to the defendants, Board of Education, Great Oaks Institute of Technology and Career Development ("Great Oaks") and Dr. Harold L. Carr, the President and CEO of Great Oaks.
 
 
 2
 * We take our summary of the facts in this case from the district court's order granting summary judgment to the defendants in this case and from its earlier published order holding that the Montgomerys had stated a claim upon which relief could be granted. Montgomery v. Carr, 848 F.Supp. 770 (S.D.Ohio 1993).
 
 
 3
 Great Oaks is a multi-campus system of secondary vocational education. Montgomery, 848 F.Supp. at 773. It consists of numerous campuses, including the Scarlet Oaks Career Development Campus in Sharonville, Ohio and the Live Oaks Career Development Campus in Milford, Ohio. Ibid. Together all of these campuses formed the Great Oaks Joint Vocational School District, now known as the Great Oaks Institute of Technology and Career Development. This district serves 35 affiliated public school districts in southwest Ohio.
 
 
 4
 Great Oaks has an anti-nepotism policy that prevents a married couple from working together as teachers at the same campus. Ibid. The policy does not apply to those couples who are simply living together.[1] Both parties agree that the anti-nepotism policy exists, even though it is not written in the Great Oaks policy manual. The policy was first implemented in 1970 by Great Oaks's original superintendent. Dr. Carr continued the policy when he became CEO of Great Oaks. Montgomery, 848 F.Supp. at 773.
 
 
 5
 Suzanne Montgomery was a teacher of computer-assisted learning at the Scarlet Oaks campus in Sharonville for nine years. She is now married to Charles Montgomery, who has been teaching applied physics at Scarlet Oaks for 11 years. The couple was married in June 1992. Suzanne and Charles had been involved romantically since about 1990 and had been living together for about one year before they were married. The couple decided to marry because they thought it was the "right" or "moral" thing to do.
 
 
 6
 Initially, the Montgomerys attempted to conceal their relationship from Great Oaks officials, even going so far as to submit false documents to Great Oaks. The Montgomerys knew that if Great Oaks learned of their marriage, one of them would have to transfer to a different school in the Great Oaks system. They knew of friends, also teachers at Scarlet Oaks, who had been transferred upon their marriage. Tim Hunter, a campus director at Scarlet Oaks, learned that the Montgomerys were married by noticing that Suzanne was wearing a wedding ring, striking up a conversation about it, and then being told by her that she had married Charles.
 
 
 7
 Great Oaks Vice President for Human Services, Sharon Lowery, then began to consider whether Suzanne or Charles should be the teacher to be transferred in compliance with the policy. In order to retain continuity of instructors for students that academic year, Lowery decided to postpone transferring either of the Montgomerys. In July 1993, after the academic year was over, Lowery told the Montgomerys that Suzanne would be transferred to Live Oaks. The transfer was purely lateral. Suzanne's pay, benefits, and job description all remained unchanged. Suzanne simply switched places with the instructor of computer-aided learning at Live Oaks. She now teaches 200 students at Live Oaks as opposed to the approximately 600 she used to teach at Scarlet Oaks.
 
 
 8
 Hunter testified that he was aware of no disruptions at school resulting from the fact that the Montgomerys were married for a part of the period during which they both taught at Scarlet Oaks. However, Suzanne's supervisor, Mary Helen Steinauer, testified that she and other teachers believed that the Montgomerys were spending too much time together. Steinauer was also concerned about Charles putting his feet up on the table in Suzanne's classroom and relayed these concerns to Charles. Steinauer testified that it was her opinion that if Charles were having a problem with a student, Suzanne might be more reluctant to deal with that student, and vice versa. Steinauer also testified that some teachers who had attempted to talk to either Charles or Suzanne at various times were turned away when the couple was talking among themselves during school hours. A Great Oaks personnel evaluation of each of them shortly after their marriage made no mention of any problems in job performance related to their marriage, however. Suzanne is described by Great Oaks alternately as an "excellent" or a "fine" teacher.
 
 
 9
 Dr. Carr testified that he was aware of "many, many successful marriage situations" involving spouses working together. Nevertheless, Dr. Carr told the district court he believed that Great Oaks's anti-nepotism policy was justified because it is based on "known management concepts" and because married couples in the same school have historically created problems for school systems that do not impose anti-nepotism policies on their teachers. While Great Oaks has not had many such problems, Dr. Carr thinks this is because its anti-nepotism policy has prevented them from arising. The district court noted that the only specific danger Dr. Carr believed the anti-nepotism policy protected against, however, was "the basic concern [that] you've got to deal with the animosity and the hostility of these two people instead of doing what you're supposed to be doing as an administrator." The district court also emphasized that Dr. Carr thought that "total chaos" would result if the anti-nepotism policy were violated, because doing so might disrupt other unwritten personnel policies.
 
 
 10
 Dr. Carr illustrated his concerns with married individuals teaching together at the same school by discussing, among other incidents, a case that he represented had arisen in the Lorain County Joint Vocational School District, where one spouse had received a negative evaluation, and the two spouses then "turned upon the school system" by using physical violence. The district court inaccurately summarized Dr. Carr's testimony when it stated that Dr. Carr had offered only one justification for the Great Oaks anti-nepotism policy, however. Dr. Carr was concerned that potential hostility from a married couple was "totally unhealthy for the school system," because this hostility "[c]onsumed energy that should have been directed to the basic mission of the school system and took away from the collegiality of the institution...." Furthermore, Dr. Carr testified that this hostility could lead to lost teacher productivity for the spouses involved, and for other teachers who were distracted by a couple's leaving a school building early together. He testified that married couples can create management problems because "[a]dministrators tend to shy away from one person because of a problem with another in a married situation."
 
 
 11
 The anti-nepotism policy has caused two kinds of harm for the Montgomerys. First, the Montgomerys now need to drive collectively about 65 miles per day more than when they drove in together, making Suzanne very uncomfortable, as she dislikes freeway driving, and costing her an extra hour per day in commuting time. Second, starting in October 1993, Suzanne began to suffer psychiatric problems, allegedly traceable to her transfer, including two breakdowns at school where she became totally overwhelmed, hysterical, and incoherent. Suzanne claims that she has been unable to work at all since April 1994. She is still under the care of a psychiatrist. She takes various antidepressant medications and sleeping pills. Nevertheless, Suzanne testified that whatever happens as a result of the anti-nepotism policy, her marriage with Charles would survive intact.
 
 
 12
 Great Oaks and Dr. Carr argue that these problems stem only from the fact that the Montgomerys grew accustomed to teaching together in the same school, and if they had simply informed Great Oaks of their marriage earlier and thus been separated earlier, these problems would not have occurred. This conclusion is, of course, not a necessary one. It could just as easily be true that the harms allegedly suffered by the couple flow directly from the anti-nepotism policy, rather than from the actions the couple took to postpone the policy's application by concealing their marriage from school officials.
 
 
 13
 The Montgomerys filed a complaint in the United States District Court for the Southern District of Ohio, alleging that the Great Oaks anti-nepotism policy violates their First Amendment associational rights to marry and Suzanne's Fifth Amendment property right not to be transferred in violation of her First Amendment rights. The district court denied the Montgomerys' motion for summary judgment, but granted the defendants' motion for summary judgment on both issues, holding that rational basis scrutiny was appropriately applied to the anti-nepotism policy in this case and, after applying this level of scrutiny, determining that the policy was constitutional. The Montgomerys appealed in a timely fashion only from the district court's rejection of their First Amendment claim.
 
 II. STANDARD OF REVIEW
 
 14
 We review a grant of summary judgment de novo, using the same standard as applied by the district court. Baggs v. Eagle-Picher Indus., 957 F.2d 268, 271 (6th Cir.), cert. denied, 506 U.S. 975, 113 S.Ct. 466, 121 L.Ed.2d 374 (1992). We must affirm the district court only if we determine that the pleadings, affidavits, and other submissions, such as the transcripts of the hearings held before the district court in this case, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When evaluating the evidence presented, we view the evidence in the light most favorable to the non-moving party. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
 
 III. THE PURPOSE OF TIERS OF SCRUTINY
 
 15
 Our primary task in this case is to decide which of the three tiers of scrutiny--minimal, intermediate, or strict--applies to state action that infringes on the First Amendment associational right to marry. Before reviewing the Supreme Court opinions on point in the traditional fashion, searching for evidence of what the Court may hold if faced with this precise question and then reasoning from these cases by analogy, we think it is useful at the outset of this opinion to pause to consider the questions of why tiers of scrutiny exist in constitutional law and what function they serve.
 
 
 16
 Our basic analysis tracks that of Jeffrey M. Shaman, Cracks in the Structure: The Coming Breakdown of the Levels of Scrutiny, 45 Ohio St. L.J. 161 (1984). Though we have a unitary Constitution, the three levels of scrutiny are with us largely in reaction to the Court's Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), jurisprudence. Shaman, supra, at 161. Minimal or rational basis scrutiny, constituting significant deference to governmental action, exists first and foremost as a way of insuring that the economic policy formulated by legislatures will not be struck down as unconstitutional because it does not comport with laissez-faire. Minimal scrutiny is the New Deal Supreme Court's response to its predecessors' creation of a substantive due process right to contract.
 
 
 17
 Strict scrutiny, by way of contrast, is the post-New Deal Supreme Court's way of affirming its view of which rights shine the brightest in the constitutional firmament. The most significant case in the rise of strict scrutiny is United States v. Carolene Prods. Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). In its celebrated fourth footnote, the Supreme Court raised the possibility that stricter judicial review should be reserved for legislative action impinging upon "discrete and insular minorities." In Laurence Tribe's words, Carolene would come to "later support increased judicial intervention in non-economic affairs." Laurence Tribe, American Constitutional Law § 8-7, at 582 (2d ed. 1988). The reaction to Lochner was initially followed by a period Tribe calls an "abdication" of the responsibility of judicial review.
 
 
 18
 Intermediate scrutiny, as its name suggests, was the most recent tier of constitutional review to develop. Its genesis lies in the Supreme Court's desire to fashion constitutional protections for women, a group that has been historically victimized by intense and irrational discrimination, but that cannot properly be called either "discrete" or "insular." A trilogy of cases taken together is generally regarded as having created the intermediate tier of scrutiny. See Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (striking down Idaho statute that gave males preference over females in appointment as administrators of estates); Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (plurality) (Brennan, J.) (discrimination in the provision of fringe benefits to spouses of female armed services members was unconstitutional); Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (statute prohibiting the sale of "nonintoxicating" 3.2% beer to males under 21 and females under 18 was unconstitutional).
 
 
 19
 The Supreme Court's authority to delineate these different tiers of judicial review is not apparent. Justices from the entire range of ideological perspectives have expressed their concerns with tiered judicial review. "There is only one Equal Protection Clause. It requires every State to govern impartially. It does not direct the courts to apply one standard of review in some cases and a different standard in other cases. Whatever criticism may be leveled at a judicial opinion implying that there are at least three such standards applies with the same force to a double standard." Craig, 429 U.S. at 211, 97 S.Ct. at 464 (Stevens, J., concurring). Justice Stevens was responding to then-Justice Rehnquist, dissenting in Craig, who argued that the creation of a tier of intermediate scrutiny had no textual basis in the Constitution. "I would think we have had enough difficulty with the two standards of review which our cases have recognized the norm of 'rational basis,' and the 'compelling state interest' required where a 'suspect classification' is involved so as to counsel weightily against the insertion of still another 'standard' between those two." Id. at 220-21, 97 S.Ct. at 469 (Rehnquist, J., dissenting). See also United States v. Virginia, --- U.S. ----, ----, 116 S.Ct. 2264, 2292, 135 L.Ed.2d 735 (1996) (Scalia, J., dissenting) ("this Court [regards itself] as free to evaluate everything under the sun by applying one of three tests: 'rational basis' scrutiny, intermediate scrutiny, or strict scrutiny. These tests are no more scientific than their names suggest, and a further element of randomness is added by the fact that it is largely up to us which test will be applied in each case."); Madsen v. Women's Health Center, Inc., 512 U.S. 753, ----, 114 S.Ct. 2516, 2538, 129 L.Ed.2d 593 (1994) (Scalia, J., concurring in part and dissenting in part) (Justices Scalia, Kennedy, and Thomas decrying the creation of an "intermediate-intermediate" tier of scrutiny in a First Amendment case).
 
 
 20
 Perhaps the most notable examples of Supreme Court opinions expressing doubts or concerns with tiered judicial review occur in Justice Marshall's jurisprudence.
 
 
 21
 Justice Marshall believ[ed] that the multi-tier approach is an oversimplification that does not accurately reflect the adjudicative process in constitutional cases. He claims that a principled reading of the Court's decisions reveals a spectrum, or 'sliding scale,' of scrutiny that is calibrated by degrees rather than by two or three tiers. Under this conception, the operative degree of scrutiny is determined by the character of the government classification in question--that is, the extent of its invidiousness--and the relative importance of the individual and state interests affected by the classification.
 
 
 22
 Shaman, supra, at 163-64 (footnotes omitted) (collecting cases). Strongly endorsing Justice Marshall's approach, Shaman argues that the tiered-scrutiny approach was overly rigid, inhibitory of intellectually honest constitutional analysis, and internally inconsistent.
 
 
 23
 Shaman's view is representative of one important strand of academic thought about the three levels of constitutional scrutiny. See, e.g., Francisco Valdes, Sexual Minorities in the Military: Charting the Constitutional Frontiers of Status and Conduct, 27 Creighton L.Rev. 381, 386, 421 (1994) (chastising courts for "slipping" into the three-tiered analysis of constitutional questions and as a result ignoring the "fact" that the "status/conduct" distinction is an "independent and absolute" prohibition on governmental classifications); Peter B. Bayer, Rationality--and the Irrational Underinclusiveness of the Civil Rights Laws, 45 Wash. & Lee L.Rev. 1, 11-12 (1988) (three tiers of scrutiny require analysis of "such similar considerations that they dissolve into one mode"). In short, this strand of thought argues that the three levels of constitutional judicial review are indeterminate, result-driven, and would better be replaced by a sliding scale approach.
 
 
 24
 The second important strand in academic writing about the tiers of constitutional judicial review begins with Lawrence Gene Sager's "underenforcement thesis."[2] Lawrence Gene Sager, Fair Measure: The Legal Status of Underenforced Constitutional Norms, 91 Harv.L.Rev. 1212 (1978). Sager argues that the real reason the Supreme Court has created the multi-tiered approach to constitutional scrutiny is its desire to give meaning to the doctrine of judicial restraint. In Sager's view, the Supreme Court believes that enforcing certain constitutional guarantees to their conceptual limits would violate the Court's standards of "competence and institutional propriety." Id. at 1226. According to Sager's underenforcement thesis, then, there is something about the rights that are "enforced" by the application of minimal, or rational basis, scrutiny that makes those rights more difficult for courts to enforce or something about those rights that is inappropriate to expand to their fullest logical extent.
 
 
 25
 There is undoubtedly some merit in Sager's argument. As Sager skillfully contends, the Equal Protection Clause, if enforced by strict scrutiny and expanded to its full conceptual limits, unfettered by the legislative history of the Fourteenth Amendment or arguments from the amendment's structure and text, could paralyze government. The norm of equality is itself not limited to protecting discrete and insular minorities. Shaman's historical explanation of the origin of the levels of scrutiny, coupled with the recognition that after Carolene Products extreme deference in the economic policy sphere and greater activism in the area of non-economic individual rights was converted into a normative principle, seems more persuasive. The notion that the judiciary is better trained as philosophers to decide questions of equality than as economists to decide questions of what economic policy is efficient seems difficult to defend. A large part of the explanation for the three tiers of constitutional judicial review is history and, candidly, a normative preference by the Supreme Court for strong protection for some types of constitutional rights over others.
 
 
 26
 In their excessive focus on Supreme Court case law, however, the commentators appear to have overlooked another, relatively simple explanation for tiered constitutional judicial review--for the Supreme Court, tiering is a useful prospective control device of decisions by the lower federal courts. Tiered review is a happy marriage of the formalistic and balancing approaches to constitutional judicial review. The Supreme Court does the balancing and the lower courts are bound to formalism. First, tiering signals to lower courts how strongly the Supreme Court feels about a particular right. The rigidity of the analysis required by tiering so much criticized by Shaman and others is arguably the source of its strength. As these commentators have persuasively pointed out, the Supreme Court itself does not seem terribly bound by the rigid rules of tiering. The lower courts are bound, however, even though the Supreme Court remains free to create new levels of scrutiny or ignore old ones. See, e.g., Virginia, --- U.S. at ----, 116 S.Ct. at 2274 (appearing to create a new standard of review for gender-based classifications, requiring an "exceedingly persuasive justification" on the part of the governmental actor). It is true that our function as a court of appeals begins to resemble more the open-ended analysis of the Supreme Court itself when we must choose the appropriate level of scrutiny and not simply apply the level that has already been fixed by the Supreme Court. However, our discretion in such situations is far from unconstrained. One of the significant advantages of the multi-tiered levels of scrutiny for the Supreme Court is that the lower federal courts will typically use the traditional method of reasoning by analogy to determine what level of constitutional scrutiny to apply in a case like this one. As we demonstrate below, application of this process of analogic reasoning in this case to precedent from the Supreme Court and our own circuit yields an analytically robust result that is almost a syllogism.
 
 IV. CHOICE OF THE LEVEL OF SCRUTINY
 
 27
 The right to marry is both a fundamental substantive due process and associational right. Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823-24, 18 L.Ed.2d 1010 (1967) (substantive due process); Roberts v. United States Jaycees, 468 U.S. 609, 619, 104 S.Ct. 3244, 3250, 82 L.Ed.2d 462 (1984) (a First Amendment associational rights case noting that marriage is a protected association, but citing a substantive due process case, Zablocki v. Redhail, 434 U.S. 374, 383-84, 98 S.Ct. 673, 679-80, 54 L.Ed.2d 618 (1978), for this proposition). In the substantive due process context, Zablocki holds that determining the appropriate level of scrutiny to apply to governmental action alleged to infringe the right of marriage requires a two-step analysis: first, a court must ask whether the policy or action is a direct or substantial interference with the right of marriage; second, if the policy or action is a direct and substantial interference with the right of marriage, apply strict scrutiny, otherwise apply rational basis scrutiny. In this context, strict scrutiny means that the state action burdening marriage cannot be upheld "unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." Zablocki, 434 U.S. at 388, 98 S.Ct. at 682.
 
 
 28
 Wright applies the Zablocki "direct and substantial interference" analysis in the Sixth Circuit directly to an anti-nepotism policy. But Wright specifically refused to decide whether Zablocki applies to First Amendment associational right to marry cases, or merely to substantive due process right to marry cases. Wright, 58 F.3d at 1134 n. 3. Supreme Court precedent, however, specifically establishes that the same level of scrutiny applies in both the First Amendment and substantive due process contexts. See Lyng v. International Union, United Auto., Aerospace & Agric. Implement Workers, 485 U.S. 360, 366, 108 S.Ct. 1184, 1189-90, 99 L.Ed.2d 380 (1988) (a First Amendment associational rights case applying the Zablocki "direct and substantial interference" test as used in a due process/equal protection case, Lyng v. Castillo, 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986)). See also Parks v. City of Warner Robins, 43 F.3d 609, 616 (11th Cir.1995) ("In International Union, United Auto., Aerospace and Agric. Implement Workers ... the Court extended the reasoning in Zablocki to apply to claims involving First Amendment associational rights.") Therefore, the level of scrutiny to be applied to state action impinging on the right to marry is invariant with respect to the precise constitutional provision undergirding that right.
 
 
 29
 Thus, in order to determine the level of scrutiny, one of the forms of heightened or mere rational basis, that we must apply in this case, we must first decide whether the anti-nepotism policy at Great Oaks was a "direct and substantial" burden on the right of marriage. This analysis forces us to conclude that the Great Oaks policy is not a "direct and substantial" burden on the right of marriage. Case law illustrates what the Supreme Court means by "direct and substantial." Two examples of "direct and substantial" burdens on the right of marriage derive from the facts of Loving and Zablocki. In Loving, the anti-miscegenation statute at issue was a "direct and substantial" burden on the right of marriage because it absolutely prohibited individuals of different races from marrying. In Zablocki, the burden on marriage was "direct and substantial" because the Wisconsin statute in that case required non-custodial parents, who were obliged to support their minor children, to obtain court permission if they wanted to marry:
 
 
 30
 Some of those in the affected class ... will never be able to obtain the necessary court order, because they either lack the financial means to meet their support obligations or [will not be able to] prove that their children will not become public charges. These persons are absolutely prevented from getting married. Many others, able in theory to satisfy the statute's requirements, will be sufficiently burdened by having to do so that they will in effect be coerced into forgoing their right to marry. And even those who can be persuaded to meet the statute's requirements suffer a serious intrusion into their freedom of choice in an area in which we have held such freedom to be fundamental.
 
 
 31
 Zablocki, 434 U.S. at 387, 98 S.Ct. at 681.
 
 
 32
 The Great Oaks anti-nepotism policy is not such a "direct and substantial" infringement upon the right of marriage. It is more like the kinds of state action that the Supreme Court has found not to meet the Zablocki test. In Califano v. Jobst, 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977), for instance, the Court upheld a Social Security Act provision that terminated benefits for a disabled dependent child when that child married someone who was ineligible for benefits. "The directness and substantiality of the interference with the freedom to marry distinguish[es] [Zablocki ] from [Jobst ]. The Social Security provisions placed no direct legal obstacle in the path of persons desiring to get married, and ... there was no evidence that the laws significantly discouraged, let alone made 'practically impossible,' any marriages." Zablocki, 434 U.S. at 387 n. 12, 98 S.Ct. at 681 n. 12 (citation omitted). See also Women Involved in Farm Economics v. United States Dep't of Agric., 876 F.2d 994, 1004 (D.C.Cir.1989) (Department of Agriculture regulation constitutional that treats husband and wife as one "person" for the purposes of paying out farm subsidies under the rational basis test; regulation was not a "direct and substantial" interference with the right to marry under Zablocki ), cert. denied, 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990); Druker v. Commissioner, 697 F.2d 46, 50 (2d Cir.1982) (same with regard to the "marriage penalty" of the Internal Revenue Code), cert. denied, 461 U.S. 957, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983). Cf. Castillo, 477 U.S. at 638, 106 S.Ct. at 2729 (upholding amendments to the Food Stamp Act that used different definitions of "household" depending on how closely related the group of people living together and applying for benefits were); International Union, United Auto., Aerospace & Agric. Implement Workers, 485 U.S. at 368, 108 S.Ct. at 1190-91 (upholding amendments to the Food Stamp Act that ended the eligibility of households where a member of the household was on strike, and that prohibited increasing existing food stamp allotments when the income of a striking household member had decreased); Bowen v. Gilliard, 483 U.S. 587, 601-02, 107 S.Ct. 3008, 3017-18, 97 L.Ed.2d 485 (1987) (district court erred in applying heightened scrutiny to AFDC program amendments that required eligibility determinations to take into account the income of all children in a household). In each of these cases the intimate association involved familial relations, but this does not diminish the relevance of these cases here, because the intimate association of marriage is part of the same category of rights. We conclude after surveying these cases that merely placing a non-oppressive burden on the decision to marry, or on those who are already married, is not sufficient to trigger heightened constitutional scrutiny.
 
 
 33
 Undoubtedly, the Great Oaks anti-nepotism policy imposes some costs and burdens on marriage. The most troubling effects of the policy seem to be Suzanne Montgomery's current psychological problems. While we must assume these ailments are real and traceable to the anti-nepotism policy, the Montgomerys have not shown that the policy would have effects of similar gravity on all couples potentially affected. It does not seem that such effects would be ordinary. And even if they were, they are not "direct" in the sense that they place an absolute barrier in the path of those who wish to marry. The indirectness of the effects of the Great Oaks anti-nepotism policy is also illustrated by the fact that full knowledge of it did not prevent the Montgomerys from marrying, nor did its application cause the breakup of their marriage.
 
 
 34
 Moreover, though the effects of the Great Oaks anti-nepotism policy are not insubstantial, neither were those effects in Castillo, International Union, United Auto., Aerospace and Agric. Implement Workers of Amer., and Bowen. The burdens found insufficient in those cases are plainly more substantial, since they cut off financial assistance to the needy, whereas the financial burdens in this case are relatively minimal. The Montgomerys, for instance, have not argued that they are unable to bear the increased financial burdens allegedly brought on by the anti-nepotism policy. A policy "is not rendered invalid simply because some persons who might otherwise have married were deterred by the rule or because some who did marry were burdened thereby." Jobst, 434 U.S. at 54, 98 S.Ct. at 99. Suzanne has also admitted that the burdens are not great enough to lead to the destruction of her marriage.
 
 
 35
 Virtually every court to have confronted a challenge to an anti-nepotism policy on First Amendment, substantive due process, equal protection, or other grounds has applied rational basis scrutiny. See Parks, 43 F.3d at 614-15 (First Amendment, substantive due process, and equal protection); Keckeisen v. Independent Sch. Dist. 612, 509 F.2d 1062, 1065-66 (8th Cir.1975) (substantive due process), cert. denied, 423 U.S. 833, 96 S.Ct. 57, 46 L.Ed.2d 51 (1975); Espinoza v. Thoma, 580 F.2d 346, 349 (8th Cir.1978) (equal protection); Cutts v. Fowler, 692 F.2d 138, 141 (D.C.Cir.1982) (substantive due process); Parsons v. County of Del Norte, 728 F.2d 1234, 1237-38 (9th Cir.) (substantive due process and equal protection), cert. denied, 469 U.S. 846, 105 S.Ct. 158, 83 L.Ed.2d 95 (1984)[3]; Mapes v. United States, 217 Ct.Cl. 115, 576 F.2d 896, 900-01 (substantive due process and equal protection), cert. denied, 439 U.S. 1046, 99 S.Ct. 722, 58 L.Ed.2d 705 (1978); Sebetic v. Hagerty, 640 F.Supp. 1274, 1276-78 (E.D.Wis.1986) (equal protection and substantive due process), aff'd sub nom. Heyden v. Schoenfeld, 819 F.2d 1144 (7th Cir.), cert. denied, 484 U.S. 899, 108 S.Ct. 235, 98 L.Ed.2d 193 (1987); Southwestern Community Action Council v. Community Servs. Admin., 462 F.Supp. 289, 296-98 (S.D.W.Va.1978) (substantive due process); Johnson v. United States, 422 F.Supp. 958, 970-76 (N.D.Ind.1976) (substantive due process, First Amendment associational rights, and Ninth and Tenth Amendment challenges), aff'd sub nom. Barter v. United States, 550 F.2d 1239 (7th Cir.1977) (per curiam), cert. denied, 434 U.S. 1012, 98 S.Ct. 725, 54 L.Ed.2d 755 (1978). See also Austin v. Berryman, 878 F.2d 786, 787 (4th Cir.1989) (en banc) (Virginia statute denying unemployment benefits to spouse who voluntarily quit work to follow other spouse to a new locality was not a violation of substantive due process, after applying rational basis scrutiny), cert. denied, 493 U.S. 941, 110 S.Ct. 343, 107 L.Ed.2d 331 (1989); Campbell v. City of Allen Park, 829 F.2d 576, 581 (6th Cir.1987) (applying rational basis scrutiny to an equal protection and substantive due process challenge to a residency requirement impinging on the right to marry). But see Thorne v. City of El Segundo, 726 F.2d 459, 469-70 (9th Cir.1983) (applying heightened scrutiny to an inquiry into the associations of a female applicant to a police academy); Dike v. School Bd. of Orange Co., 650 F.2d 783, 787 (5th Cir. Unit B July 1981) (applying strict scrutiny to prohibition on teacher breast-feeding infant during workday); Buckley v. Coyle Public Sch. Sys., 476 F.2d 92, 96 (10th Cir.1973) (applying strict scrutiny to mandatory maternity-leave policy). These three latter cases may have involved intimate associations, but they also involved policies that infringed only on the rights of women. There is no allegation in this case that Great Oaks's anti-nepotism policy is exclusively directed at women or disproportionately affects women. The Montgomerys, for instance, do not allege that Great Oaks's policy always leads to the wife in a married couple being transferred. Such a policy would present a much stronger case for the application of some form of heightened scrutiny.
 
 
 36
 Moreover, the Montgomerys concede that strict scrutiny is inappropriate. Hence cases like Dike, Thorne, and Buckley are of no use to them.[4] To support their claim that intermediate scrutiny should be applied, the Montgomerys cite Adkins v. Board of Educ. of Magoffin Co., 982 F.2d 952, 956 (6th Cir.1993). The plaintiff in Adkins was the secretary to and wife of a high school principal. She alleged that she was not rehired by the superintendent of the board of education because the superintendent disliked her husband. Having been involved in various administrative disputes with her husband in the past, the superintendent allegedly feared that the plaintiff would be angered at the conflicts. The superintendent stated that if he could not get rid of her husband, getting rid of the plaintiff was "the next best thing."
 
 
 37
 Adkins does not discuss the Loving-Zablocki line of cases. It merely cited Roberts, 468 U.S. 609, 104 S.Ct. 3244, for the proposition that freedom of marital association was a fundamental right. The Adkins court then went on to state that the secretary in that case had alleged that a clearly established constitutional right of hers had been violated, because "[t]he right of association is violated if the action constitutes an 'undue intrusion' by the state into the marriage relationship." Adkins, 982 F.2d at 956 (quoting Roberts, 468 U.S. at 618-19, 104 S.Ct. at 3249-50).
 
 
 38
 Great Oaks attempts to distinguish Adkins by arguing that the case only concerned a single incident of personal animosity and not an entire policy. While we agree that Adkins is distinguishable, as we explain below, we note that we are not persuaded that the basis for distinguishing between this case and Adkins should rest even partially on the notion that isolated instances of state action should be treated any differently than broad-ranging state policies. State officials acting without the authority of any general policy should not necessarily be barred from deciding in an isolated case to transfer one of two co-worker spouses because that official believes that the couple's marriage is interfering with legitimate governmental objectives. Wright recognizes this in its rejection of a selective enforcement argument made by the plaintiffs in that case. Wright, 58 F.3d at 1137 n. 7. A selectively enforced policy is very similar in this respect to an isolated executive decision. We will not create a rule in this circuit that has no basis in the Supreme Court's associational rights decisions, a rule that ad hoc executive decisions imposing burdens on married co-workers in order to promote a governmental end should be treated differently from policies of general application designed to serve the same end. To the extent any of the following cases cited by the Montgomerys hold to the contrary, we reject them: Morfin v. Albuquerque Public Schools, 906 F.2d 1434, 1439-40 (10th Cir.1990); Hall v. Board of Educ., 639 F.Supp. 501, 512 (N.D.Ill.1986); Newborn v. Morrison, 440 F.Supp. 623, 626-27 (S.D.Ill.1977).[5]
 
 
 39
 We do not think, however, that Adkins or any of the other cases similar to Adkins cited by the Montgomerys, such as Morfin, do hold to the contrary. As the district court laconically recognized here, the difference between cases like these and cases challenging anti-nepotism policies does not, in the main, lie in the contrast between policies and individual decisions. In the words of the district court, "Transfer based solely upon associational activities protected by the First Amendment is an 'adverse employment action' sufficient to trigger constitutional analysis, whether those associational activities are political, social or marital." (Emphasis supplied.) If the only motivation for a public official in taking some adverse employment action against a public employee is the public employee's protected activity, then regardless of the level of scrutiny applied, such action is unconstitutional. This kind of adverse employment action flunks even the rational basis test. Hence, inquiry into the proper level of scrutiny tends to be skipped when individual adverse employment actions are being challenged in a summary judgment or Fed.R.Civ.P. 12(b)(6) procedural posture. It will always be possible to plead that an illegitimate motivation is the only motivation for a public employer's actions. And it will always be possible for legitimate disputes about the motivations of public employers to prevent the entry of summary judgment. If the right to marry is the protected association allegedly being infringed upon, however, even by an individual act, and such infringement is partially motivated by legitimate governmental objectives, then the final decision on the merits of the case must, of necessity, apply rational basis review to the legitimate policies that motivated the act.
 
 
 40
 To avoid this conclusion, the Montgomerys make several other arguments, many of which are based on Eleventh Circuit precedent.[6] In McCabe v. Sharrett, 12 F.3d 1558, 1562 (11th Cir.1994), the Eleventh Circuit held that some form of heightened scrutiny should apply to a police chief's determination to transfer his secretary after he learned that she had married a line patrol officer. McCabe 's discussion of the appropriate level of scrutiny conflicts with a similar discussion in Parks, another Eleventh Circuit case. Parks distinguished McCabe on the ground that the latter case involved a particular executive decision, rather than a legislative policy. Parks, 43 F.3d at 613 n. 2. Based on the Eleventh Circuit's attempt to distinguish the two cases, the Montgomerys argue that the decision by Great Oaks to transfer Suzanne in this case was an executive decision and thus should be governed by some form of heightened scrutiny.
 
 
 41
 In rejecting this argument, we note first that the Parks footnote also indicates that its conception of a legislative policy includes "broad-ranging executive regulations." The Montgomerys appear to concede, however, that this case involves a "broad-ranging" executive regulation. The Montgomerys characterize the Great Oaks unwritten anti-nepotism thusly: "[in a case] such as this ... what is at issue is the employer's executive policy-making of a per se rule which permits the taking of adverse employment action with no individualized inquiry at all." Montgomerys' Brief at 20-21 (emphasis in original). Therefore, even if we were to hew to the Parks-McCabe executive action/legislative policy distinction, we would have a strong argument here that heightened scrutiny should not apply because Great Oaks's anti-nepotism policy is a "broad-ranging" executive regulation, though an unwritten one. We will take the more direct route, however, and simply reject the Parks-McCabe distinction entirely. Whatever the form of the governmental action involved, legislative or executive, general or isolated, rational basis scrutiny will apply to the rationales offered by the governmental defendants in cases presenting a claim that a plaintiff's associational right to marry has been infringed, unless the burden on the right to marry is "direct and substantial."
 
 
 42
 The Montgomerys argue that the executive action/legislative policy distinction finds support in a concurrence by Justice Stevens, but that opinion merely argues that Congress should receive more deference from courts when construing Congress's own legislation than administrative agencies should receive when courts are construing administrative regulations and that Congress should receive greater deference when its economic policy legislation incidentally infringes on speech than when its legislation is content-based. See Turner Broadcasting Sys. v. FCC, 512 U.S. 622, ---- n. 2, 114 S.Ct. 2445, 2473 n. 2, 129 L.Ed.2d 497 (1994) (Stevens, J., concurring).
 
 
 43
 It is also true, as the Montgomerys point out, that the Elrod-Branti-Rutan line of cases, a major force behind the McCabe decision, has applied heightened scrutiny to the practice of political patronage. See Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality); Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); Rutan v. Republican Party of Ill., 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). However, these cases are distinguishable in that they go to the core of the First Amendment's protection of political expression and affiliation, whereas the newer substantive due process rights, like the right to marry, protect freedoms of a different sort. The constitutional concerns behind the latter kinds of cases should be and are enforced by means of a lower level of scrutiny. Thus, there is no solid basis in Supreme Court precedent for creating the distinction the Eleventh Circuit has chosen to erect and that the Montgomerys urge us to adopt.
 
 
 44
 Finally, the Montgomerys make much of the fact that the district court in this case refused to follow McCabe in light of Waters v. Churchill, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality). Waters is not terribly relevant here because it does not involve the Loving-Zablocki line of cases or their First Amendment analogs, however. Moreover, the district court only cited Waters for the proposition that the Supreme Court consistently gives more deference to government predictions of harm stemming from the speech of public employees than to similar predictions offered to justify restrictions on the speech of the public at large. Waters, 511 U.S. at ----, 114 S.Ct. at 1887. This should be an uncontroversial point. While the right-privilege distinction has been dealt a serious blow by the rise of unconstitutional conditions doctrine in cases like Elrod, it is not entirely defunct.
 
 
 45
 To support their argument that the district court's reliance on Waters is misplaced, the Montgomerys cite United States v. National Treasury Employees Union, 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). National Treasury Employees Union held that those portions of a federal statute prohibiting low-level federal employees from accepting honoraria were a violation of the First Amendment. The case distinguished the statement in Waters that public employees are due less protection than the public at large on the basis that the Pickering[7] line of cases deals with the speech of individual public employee post-hoc, whereas the speech of a category of public employees was being prohibited in National Treasury Employees Union and had not yet occurred.
 
 
 46
 The Montgomerys analogize the effect on teacher marriages caused by the Great Oaks anti-nepotism policy to the chilling effect described in National Treasury Employees Union and argue that because the Great Oaks anti-nepotism policy deters marriage at the margin, it is more like National Treasury Employees Union than like Waters. There are two reasons why National Treasury Employees Union is inapplicable to this case, however. First, National Treasury Employees Union is a case involving speech on matters of public concern, and so is not applicable in right to marry cases. See National Treasury Employees Union, 513 U.S. at ----, 115 S.Ct. at 1017 ("[t]he fact that [the honoraria ban] singles out expressive activity for special regulation heightens the government's burden of justification"--in other words, it was important for level-of-scrutiny purposes that the case involved the right to free speech ). Second, under the Montgomerys' interpretation of National Treasury Employees Union, not only is the district court's application of Waters in this case suspect, but National Treasury Employees Union must be read to overrule the Loving-Zablocki line of cases, particularly the statement in Jobst that a policy is not rendered invalid because some persons who might otherwise have married are deterred by that rule from getting married. All laws that "impact" marriage will deter it at the margin. Women Involved in Farm Economics, 876 F.2d 994; Druker, 697 F.2d 46. National Treasury Employees Union, however, does not even mention the Loving-Zablocki line of cases. We lack the power to hold that a Supreme Court case has been overruled by implication. Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 1921-22, 104 L.Ed.2d 526 (1989). Moreover, we do not think that National Treasury Employees Union has overruled the Loving-Zablocki line of cases and their First Amendment counterparts.
 
 V. APPLICATION OF RATIONAL BASIS SCRUTINY
 
 47
 Having established that the Great Oaks anti-nepotism policy does not constitute a "direct and substantial" burden on the right to marry, we are obliged to apply rational basis scrutiny for the purpose of determining whether the anti-nepotism policy in this case is unconstitutional under the First Amendment. "Under this analysis, [a state policy] is invalid if it fails to advance a legitimate governmental interest or it is an unreasonable means of advancing a legitimate government interest." Curto v. City of Harper Woods, 954 F.2d 1237, 1243 (6th Cir.1992) (per curiam) (citing Williamson v. Lee Optical, 348 U.S. 483, 487-88, 75 S.Ct. 461, 464-65, 99 L.Ed. 563 (1955)). The means chosen need not be the best for achieving these stated ends, but need only be rational in view of those ends. Interstate Towing Ass'n, Inc. v. City of Cincinnati, 6 F.3d 1154, 1166 (6th Cir.1993).
 
 
 48
 In this case, the district court incorrectly noted that Dr. Carr had stated only one basis for the Great Oaks anti-nepotism policy--avoiding the friction that might be caused on the various campuses of Great Oaks if a marriage between teachers went sour. The district court ignored other testimony by Dr. Carr as well as the supporting reasons behind the policy offered by Steinauer. Moreover, Great Oaks "is not [even] required to state the purpose of its [policy] if the reviewing court may glean these reasons from the record." Wright, 58 F.3d at 1136.
 
 
 49
 The complete list of possible justifications for the Great Oaks anti-nepotism policy gleaned from our study of the record is as follows: (1) avoiding friction and possibly violence in the workplace if a marriage between teachers broke down, (2) preventing one spouse from prejudging students that the other spouse had already experienced difficulties with, (3) cutting down on social fraternization that can hinder the availability of married teachers for educational consultations with other teachers, (4) minimizing the friction caused by married teachers who have a "you and I against the world" mentality, thereby detracting from the educational mission of the Great Oaks school system, (5) promoting collegiality among teachers[8], (6) minimizing lost productivity among married couples and other teachers, (7) easing the task of managing teachers at the Great Oaks schools; (8) avoiding the "total chaos" that would result from the disruption of other unwritten personnel policies that might be violated if the Great Oaks administration allowed its anti-nepotism policy to be ignored.
 
 
 50
 Most, if not all, of these eight justifications are sufficient to support the constitutionality of Great Oaks's anti-nepotism policy under the rational basis standard. Each represents a legitimate government interest and we conclude that an anti-nepotism policy is not an irrational means for securing such governmental interests. Consider, for example, the justification that the anti-nepotism policy seeks to avoid friction and disharmony at Great Oaks. Married couples tend to confront adversity as a unit, so it is not irrational to expect that if Great Oaks took some action that concededly injured one spouse, the other spouse would be likely to take his or her partner's side in any conflict, whereas two unmarried individuals will not, as a general matter, be as loyal to one another in such situations. The possibility for additional hostility resulting from adverse employment or other actions by school administrators in turn opens up the possibility that an educational institution could be affected in all sorts of negative ways, causing, for instance, greater conflicts among teachers and students and the frittering away of energies that could be better spent on educational priorities.
 
 
 51
 None of the justifications offered by Great Oaks is overwhelming, but they do not have be. The justifications offered merely have to be rational in their tendency to further a legitimate governmental aim. The Montgomerys even admit the fact that if we decide to apply rational basis scrutiny, their appeal must be rejected. "Whether plaintiffs like it or not, it is too late in the judicial day for plaintiffs to ask this court to conclude that 'no-spouse' policies do not pass muster under rational basis scrutiny." Montgomerys' Brief at 14. Finally, the district court and court of appeals cases cited above applying the rational basis test to anti-nepotism policies all concluded as well that such policies passed rational basis muster. Wright, for instance, held that, "we conclude that MetroHealth's nepotism policy, which prevents spouses from working together in the same unit, is rationally related to the legitimate governmental interest of avoiding conflicts of interest and preventing harm to the morale of other employees." Wright, 58 F.3d at 1137-38.
 
 
 52
 The Montgomerys' best argument that the justifications offered by Great Oaks are in fact irrational is that the policy does not apply to teaching couples that are simply living together without the benefit of marriage, i.e., that the Great Oaks anti-nepotism policy is deficient because it is underinclusive. In Wright, however, the court decided that even an anti-nepotism policy that was selectively applied was rational. The Great Oaks policy is much more consistent in its application. A blanket rule that separates out the category of amorously involved people who are most likely to be fiercely loyal to one another and cause the kind of problems that the Great Oaks policy is designed to prevent is not irrational. The need to deal with the record-keeping requirements of the tax law also makes it easier to discover that two teachers have married. It would be very difficult for Great Oaks to apply its transfer policy to cohabitating teachers because it is more difficult for the school system to discover that a couple is cohabiting. Moreover, the underinclusiveness precedent cited by the Montgomerys comes from the free speech context, not the right to marry context. We have not been able to locate any cases holding that a statute or other form of state action impinging on the right to marry is constitutionally infirm because it is underinclusive.
 
 
 53
 The underinclusiveness argument here resembles the argument rejected in Campbell v. City of Allen Park that a city's refusal to waive its residency requirement for employees of its fire department, after one of its employee became married to a firefighter in a different city with a similar residency requirement, was irrational. In a particular instance, a rule of general application may be irrational, but this does not prove the rule irrational on the whole. Campbell was an equal protection and substantive due process-based right to marry case. However, the Supreme Court precedent applying substantive due process and equal protection right to marriage cases to First Amendment right to marriage association cases means that Campbell can be cited to support our rejection of the Montgomerys' underinclusiveness argument, even though Campbell itself noted in a dictum that different standards would apply in a First Amendment case. Campbell, 829 F.2d at 581. We do not read the Campbell dictum to indicate that a right to marry case would have been decided differently if based on a First Amendment, rather than a substantive due process theory, however. Moreover, as we have already squarely held, state action impinging on the right to marry is to be reviewed in the same fashion whether advanced on the theory that it violates substantive due process or advanced on the theory that it violates the First Amendment's right to intimate association. Therefore, if the Campbell dictum conflicts with our holding in this case, we reject it.
 
 
 54
 The Montgomerys also argue that the fact that Great Oaks itself never experienced any disruptions resulting from marriages between teachers somehow shows that the policy is irrational. The fact that the policy was put into place at the inception of the Great Oaks system and may have prevented the problems it was designed to prevent cannot be used as a sword against Great Oaks. Dr. Carr testified that he was aware of problems at other schools resulting from marriages among teachers. The Montgomerys did not contest Dr. Carr's testimony in this regard. Therefore, we must conclude that the Great Oaks policy is rational even if Great Oaks has never witnessed any of the parade of horribles it has asserted. The Montgomerys do cite some precedent to support their argument, however: "[w]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'.... It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." National Treasury Employees Union, 513 U.S. at ----, 115 S.Ct. at 1017, quoting Turner, 512 U.S. at ----, 114 S.Ct. at 2470. But this precedent is from a speech case, not a right to marry case, and involves a higher level of scrutiny. The Montgomerys also point out that even in cases involving commercial speech, which receives less protection, prophylactic measures must "contribute in a material way to solving the problem." Edenfield v. Fane, 507 U.S. 761, 776, 113 S.Ct. 1792, 1803, 123 L.Ed.2d 543 (1993). We recognize that this is true, but emphasize that commercial speech cases are speech cases nonetheless and not right to marry cases. Also, the quotation the Montgomerys rely on from National Treasury Employees Union does not indicate that the recited harms must manifest themselves in an individual case. Great Oaks has offered unrebutted testimony that permitting married teachers to work together has led to problems in other schools. Such testimony would likely suffice as more than the mere "positing the existence of a disease," even under National Treasury Employees Union.
 
 VI
 
 55
 We AFFIRM the district court's grant of summary judgment to Dr. Carr and Great Oaks.
 
 
 
 *
 The Honorable John Corbett O'Meara, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Tim Hunter testified that Great Oaks's anti-nepotism policy applies to those who are "romantically involved who volunteer that information." However, the Montgomerys argue in their brief that Dr. Carr testified that the anti-nepotism policy did not apply to those who were merely living together. Whether the Montgomerys are correct is unclear from Dr. Carr's testimony. The district court did not make any findings on this precise point. On the one hand, Dr. Carr merely testified that Great Oaks was not going to go out on a "witch-hunt" to determine whether teachers were living together. On the other hand, Dr. Carr testified that, if a pair of teachers who were living together came to him and asked whether one would need to transfer, they would not have been separated unless "it [became] a problem for the operational unit and it affect[ed] the educational and environment and productivity of that unit...." In connection with this testimony, Dr. Carr also testified that he believed it made sense to limit the anti-nepotism policy to married teachers even though teachers in the same school who were merely living together could create worse problems for Great Oaks than the problems created by married teachers. In light of the ambiguity in Dr. Carr's testimony, we must assume, in the context of reviewing the grant of a motion for summary judgment against the Montgomerys, that Dr. Carr testified that the anti-nepotism policy did not apply to cohabitation. The same is true in terms of the conflict between some of Dr. Carr's testimony on this point and Hunter's testimony
 
 
 [2]
 Other strands of academic thought exist as well, but they are less pronounced. See, e.g., R. Randall Kelso, Three Years Hence: An Update on Filling Gaps in the Supreme Court's Approach to Constitutional Review of Legislation, 36 S. Tex. L.Rev. 1 (1995) (arguing that many subtly different, but substantially similar, standards of review are actually in use and that the Supreme Court should harmonize the differences between them into three basic, undifferentiated tiers of review); Norman R. Williams II, Note, Rising Above Factionalism: A Madisonian Theory of Judicial Review, 69 N.Y.U. L.Rev. 963, 991 (1994) (arguing that James Madison's theory of judicial review would not have countenanced different tiers of scrutiny)
 
 
 [3]
 The Montgomerys attempt to distinguish Espinoza and Parsons on the grounds that they predate the Supreme Court's decision in Roberts. This attempt fails because Roberts merely follows the Zablocki line of cases and Zablocki predates both Espinoza and Parsons--it does not establish a different standard. Moreover, this argument, even if accepted, provides no reason for us to ignore the other cases applying minimal scrutiny cited in this paragraph that post-date Roberts
 
 
 [4]
 For similar reasons, a case cited at oral argument by the Montgomerys is also useless to them. See O'Neill v. Dent, 364 F.Supp. 565, 580 (E.D.N.Y.1973) (applying strict scrutiny to a ban on married cadets at the United States Merchant Marine Academy)
 
 
 [5]
 In these cases, the relevant courts allowed, in the § 1983 context, claims of isolated instances of retaliation by public officials impinging upon the right to marry to go forward. Morfin and Hall reversed grants of summary judgment for the defendants in those cases and Newborn held that the plaintiffs had stated a claim upon which relief could be granted
 
 
 [6]
 We do not address one of the Eleventh Circuit cases cited by the Montgomerys. The panel in Shahar v. Bowers, 70 F.3d 1218 (11th Cir.1995), a case where the plaintiff claimed that her right to marry a lesbian companion was infringed when an offer of employment was withdrawn by the Attorney General of Georgia, agreed to employ strict scrutiny, but offered three very different rationales for doing so. Shahar has now been vacated and set for rehearing by the Eleventh Circuit en banc, 78 F.3d 499 (1996), and thus does not formally exist as persuasive authority
 
 
 [7]
 See Pickering v. Board of Educ. of Township High School Dist., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (creating a form of intermediate scrutiny that balances governmental interests against its employee's First Amendment rights)
 
 
 [8]
 The logical malleability of a collegiality justification for state action related to nepotism in the rational basis context does not escape us. In Kotch v. Board of River Port Pilot Comm'rs, 330 U.S. 552, 555, 563, 67 S.Ct. 910, 911-12, 915-16, 91 L.Ed. 1093 (1947), for instance, the Supreme Court held that a pro-nepotism policy might be rational because a state legislature could have concluded that such a policy provided "benefits to morale and esprit de corps...." Even discarding the collegiality rationale, however, there are a number of other plausible and less malleable rationales that Great Oaks offers to defend its anti-nepotism policy. The malleability of rational basis analysis is one reason commentators have criticized the application of a tiered-process of judicial review. As we have indicated in Section III, however, we are obliged to follow this approach to judicial review nonetheless