RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0209p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DAVID ERMOLD; DAVID MOORE,

        *Plaintiffs-Appellees* (17-6119),

  *Plaintiffs-Appellees/Cross-Appellants* (17-6119 & 17-6233),

    v.

KIM DAVIS, Individually,

        *Defendant-Appellant* (17-6119),

ELWOOD CAUDILL, JR., Clerk of Rowan County, Kentucky,

   *Defendant-Appellant/Cross Appellee* (17-6119 & 17-6233).

                            > Nos. 17-6119/6120/6226/6233

─────────────────────────────────────────────

WILL SMITH; JAMES YATES,

        *Plaintiffs-Appellees* (17-6120),

  *Plaintiffs-Appellees/Cross-Appellants* (17-6120 & 17-6226),

    *v*.

KIM DAVIS, Individually,

        *Defendant-Appellant* (17-6120),

ELWOOD CAUDILL, JR., Clerk of Rowan County, Kentucky,

   *Defendant-Appellant/Cross-Appellee* (17-6120 & 17-6226),

ROWAN COUNTY, KENTUCKY,

        *Defendant-Appellee* (17-6226).

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 0:15-cv-00046—David L. Bunning, District Judge.

Argued: January 31, 2019

Decided and Filed: August 23, 2019

Before: GRIFFIN, WHITE, and BUSH, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Roger K. Gannam, LIBERTY COUNSEL, Orlando, Florida, for Kim Davis and Elwood Caudill, Jr. Michael J. Gartland, DELCOTTO LAW GROUP PLLC, Lexington, Kentucky, for David Ermold and David Moore. W. Kash Stilz, Jr., ROUSH & STILZ, P.S.C., Covington, Kentucky, for James Yates and Will Smith. Mary Ann Stewart, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Rowan County. **ON BRIEF:** Roger K. Gannam, Mathew D. Staver, Horatio G. Mihet, Kristina J. Wenberg, LIBERTY COUNSEL, Orlando, Florida, for Kim Davis and Elwood Caudill, Jr. Michael J. Gartland, DELCOTTO LAW GROUP PLLC, Lexington, Kentucky, for David Ermold and David Moore. W. Kash Stilz, Jr., ROUSH & STILZ, P.S.C., Covington, Kentucky, for James Yates and Will Smith. Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Rowan County.

GRIFFIN, J., delivered the opinion of the court in which WHITE, J., joined. BUSH, J. (pp. 12–18), delivered a separate opinion concurring in part and in the judgment.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.

At first glance, this case appears simple. When Kim Davis was County Clerk for Rowan County, Kentucky, the Supreme Court recognized a constitutional right to same-sex marriage. One of Davis's duties as County Clerk was to issue marriage licenses. But she believed same-sex marriage was immoral, so she stopped issuing them. Plaintiffs, two couples who sought licenses and were rebuffed, sued her for depriving them of their right to marry.

But Davis claims she is immune from suit, which complicates matters. That's because the law treats Davis not as one person, but as two: an official and an individual. The doctrine of *sovereign* immunity shields Davis as an *official* if, when refusing to issue marriage licenses, she acted on Kentucky's behalf—but not if she acted on Rowan County's behalf. And the doctrine of *qualified* immunity shields Davis as an *individual* if she didn't violate plaintiffs' right to marry or, if she did, if the right wasn't clearly established when she acted.

And this case comes to us at a relatively early stage. The district court hasn't issued a final ruling, a trial hasn't occurred, and the parties haven't completed discovery. That means we don't look at evidence; we look at allegations. So we ask not whether Davis definitively violated plaintiffs' rights but whether they adequately allege that she did.

The district court ruled that Davis, as an official, acted on Kentucky's behalf, meaning sovereign immunity protected her. Plaintiffs dispute that ruling. The court also ruled that plaintiffs pleaded a plausible case that Davis, as an individual, violated their right to marry and that the right was clearly established, meaning qualified immunity didn't protect her. Davis disputes that ruling. We agree with the district court on both issues and therefore affirm.

I.

In the summer of 2015, Kim Davis was the County Clerk for Rowan County, Kentucky. One of her responsibilities was to issue marriage licenses. But same-sex marriage offended her religious beliefs, so when the Supreme Court recognized a constitutional right to same-sex marriage in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), Davis took matters into her own hands.

One day after the Supreme Court released *Obergefell*, Davis stopped issuing marriage licenses. She didn't discriminate against same-sex couples, though; she stopped issuing licenses altogether. That meant that when plaintiffs—two same-sex couples who lived in Rowan County—sought marriage licenses from the Clerk's Office, they couldn't get them.

With a constitutional right to marry yet no ability to obtain marriage licenses within Rowan County, plaintiffs sued Davis in her individual capacity and in her official capacity as County Clerk. One of the couples also sued the County. Plaintiffs sought damages for Davis's violation of their right to marry.

In a different lawsuit over Davis's conduct (which is before us on a challenge to an attorney's-fees award), the district court enjoined Davis from refusing to issue marriage licenses. With the injunction in place, plaintiffs obtained marriage licenses.

A challenge to that injunction came to our court.  Before we could rule on the dispute, however, Kentucky legislators changed the law in a way that convinced Davis to issue licenses without objection.  *See* 2016 Kentucky Laws Ch. 132 (SB 216).  So Davis asked us to dismiss her appeal, which we did.  *Miller v. Davis*, 667 F. App'x 537, 538 (6th Cir. 2016).

The district court read our opinion so broadly that it dismissed plaintiffs' cases as well, ruling that there was no longer a legal dispute because Davis had agreed to issue marriage licenses.  Two plaintiffs appealed the dismissal, and we reversed because they sought damages for the past deprivation of their right to marry, which meant there was still a dispute to resolve.  *Ermold v. Davis*, 855 F.3d 715, 720 (6th Cir. 2017).

On remand, the district court also re-opened the other two plaintiffs' case.  Davis then moved to dismiss the complaints, arguing that sovereign immunity shielded her from suit in her official capacity and that qualified immunity shielded her from suit in her individual capacity.  The district court sided with plaintiffs on the qualified-immunity issue (ruling that the doctrine didn't shield her) and with Davis on the sovereign-immunity issue (ruling that the doctrine did).

Davis appealed the denial of qualified immunity, and plaintiffs appealed the grant of sovereign immunity.  After the parties submitted their briefs, Elwood Caudill, Jr. replaced Davis as Rowan County Clerk and thus became a defendant and cross-appellee in his official capacity.

II.

We begin with sovereign immunity.  Unless a State consents to be sued, it enjoys immunity from private lawsuits seeking damages.  U.S. Const. amend. XI; *Crabbs v. Scott*, 786 F.3d 426, 428 (6th Cir. 2015).  And because lawsuits against state officials in their official capacities equate to lawsuits against the State itself, *see Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985), sovereign immunity shields state officials as well.  But the doctrine doesn't extend to counties and county officials.  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).

Whether sovereign immunity protects an official from being sued in her official capacity, then, depends on her role in government.  Sometimes the inquiry is easy. A governor obviously

is a state official; a mayor obviously is not.  But not all officials operate within jurisdictional silos—some have hybrid duties in which they serve both state and local government.  In such scenarios, immunity depends on which entity the official serves when engaging in the challenged conduct. *McMillian v. Monroe Cty.*, 520 U.S. 781, 785 & n. 2 (1997).  And that inquiry turns on how state and local law treat the official. *Id*. at 786.

Here, plaintiffs contend that when Davis stopped issuing marriage licenses, she acted on the County's behalf.  Caudill and the County, however, claim Davis acted on Kentucky's behalf.  To resolve this dispute, we must examine and balance six factors:

1. The State's potential liability for a judgment;
2. How state statutes and courts refer to the official;
3. Who appointed the official;
4. Who pays the official;
5. The degree of state control over the official; and
6. Whether the functions involved fell within the traditional purview of state or local government.

*Crabbs*, 786 F.3d at 429.

The first and fourth factors are neutral.  Kentucky law appears silent on which level of government must pay for a judgment against a county clerk or clerk's office, and the parties have provided us nothing but tangentially related hypotheticals about who might pay.  Clerk's offices in Kentucky are self-funded.  They operate using money from the fees they collect—fees that come from both state and county sources.  So both state and county money paid Davis's salary.  And if plaintiffs secured a judgment against Davis in her official capacity (now Caudill in his official capacity) and the Clerk's Office paid the judgment with the money it controls, that money would have both state and local origins.

The second and third factors weigh in favor of Davis having acted on the County's behalf.  The Kentucky Constitution refers to clerks as county officials.  Ky. Const. § 99.  Kentucky courts have also generally characterized county clerks as county officials. *See, e.g.*, *Carroll v. Reed*, 425 S.W.3d 921, 924 (Ky. Ct. App. 2014); *St. Matthews Fire Prot. Dist. v. Aubrey*, 304 S.W.3d 56, 60 (Ky. Ct. App. 2009).  County residents elect county clerks.  Ky.

Const. § 99.  And if there is a vacancy, a county judge or executive appoints a new clerk.  Ky. Rev. Stat. § 63.220.  But these factors offer little help because they pertain to county clerks generally, and no party contests that county clerks mostly work on the behalf of counties—hence the title *county* clerk.  What we need is legal authority specific to marriage licensing.

The fifth and sixth factors give us that authority, and they show that Davis acted on the State's behalf.  Only Kentucky can discipline county clerks.  *See* Ky. Const. § 68; Ky. Rev. Stat. §§ 402.990(6), 522.020–030; *Lowe v. Commonwealth*, 60 Ky. 237 (Ky. 1860).  And Kentucky has "absolute jurisdiction over the regulation of the institution of marriage."  *Pinkhasov v. Petocz*, 331 S.W.3d 285, 291 (Ky. Ct. App. 2011) (citations omitted).  Indeed, Kentucky law governs everything about marriage.  It defines marriage and sets eligibility requirements.  Ky. Rev. Stat. §§ 402.005, 402.010, 402.020.  It vests courts with the authority to declare certain marriages void.  *Id*. at § 402.030.  It describes who may solemnize a marriage and requires a couple to obtain a marriage license prior to marrying.  *Id*. at §§ 402.050, 402.080.  It sets out the process for licensing and recording a marriage.  *Id*. at §§ 402.100–402.240.  And specific to Davis, Kentucky law vests county clerks with the duty of issuing marriage licenses, recording marriage certificates, and reporting marriages.  *Id*. at §§ 402.080, 402.220, 402.230.  So Kentucky controls every aspect of how county clerks issue marriage licenses; Rowan County has no say whatsoever.

Plaintiffs acknowledge Kentucky's general control over marriage, but they contend that when Davis refused to issue licenses, she made a discretionary policy on Rowan County's behalf.  If true, sovereign immunity wouldn't shield Davis because when an official applies state law that leaves the method of application to her discretion, she acts on behalf of local government.

Perhaps the best example of this principle is *Brotherton v. Cleveland*, 173 F.3d 552 (6th Cir. 1999).  There, Ohio law allowed county coroners to remove corneas for medical use.  *Id*. at 555.  The law didn't specify the process for doing so, but it permitted removal only when the coroner had no knowledge of an objection by the decedent or certain others.  *Id*. at 556.  One coroner established a policy of intentional ignorance to potential objections, which meant his subordinates didn't review medical records or paperwork pertaining to a corpse before removing

its corneas.  *Id*.  When sued in his official capacity for making that policy, the coroner claimed that sovereign immunity protected him from suit.  *Id*. at 562.  We rejected his argument, holding that he had acted without state compulsion, had selected a policy for his county, and had thus acted on the county's behalf, not the State's.  *Id*. at 567.

In comparing Davis's actions to those of the coroner in *Brotherton* (and to other, similar cases), plaintiffs conflate discretion with insubordination.  Whereas Ohio's cornea-harvesting law left to officials the method of application, Kentucky's marriage-licensing laws gave county clerks no wiggle room.  Kentucky *required* Davis to issue marriage licenses to eligible couples.  *See, e.g.*, Ky. Rev. Stat. § 402.100 ("Each county clerk *shall make available* to the public the form prescribed by the Department for Libraries and Archives for the issuance of a marriage license.") (emphasis added); *id*. at § 402.110 ("In issuing the license the clerk *shall deliver* it in its entirety to the licensee." (emphasis added)); *id*. at § 402.080 (2017) ("The license *shall be issued* by the clerk of the county in which the female resides at the time, unless the female is eighteen (18) years of age or over or a widow, and the license is issued on her application in person or by writing signed by her, in which case it may be issued by any county clerk.") (emphasis added).  Plaintiffs have cited no authority suggesting that if a county official acting on the State's behalf fails to do her job, that failure transforms the source of her power from the State to the county.  Indeed, such a proposition would make little sense; for whom an official acts has nothing to do with how well she acts.  Davis's refusal to issue licenses, then, did nothing to change the government she acted for.

Because Davis acted on Kentucky's behalf when issuing (and refusing to issue) marriage licenses, sovereign immunity protects her (and now Caudill, as the current county clerk) from an official-capacity suit.

### III.

Next, we turn to qualified immunity, which shields a government official from a lawsuit against her in her individual capacity if (1) she didn't violate any of the plaintiff's constitutional rights or (2) the rights, if violated, weren't "clearly established" at the time of the alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  Put differently, the doctrine

protects "all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 137 S. Ct. 548, 551 (2017). Davis challenges the district court's denial of her motion to dismiss, which places our focus on plaintiffs' allegations. If they adequately allege the violation of a clearly established right, we must affirm. *See Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898–99 (6th Cir. 2019) (discussing the interplay between qualified immunity and the motion-to-dismiss standard).

That they do. Plaintiffs allege that: (1) the Fourteenth Amendment guarantees them the right, as same-sex couples, to marry; (2) they sought marriage licenses from Davis, whom Kentucky tasked with issuing those licenses; (3) under Kentucky law, they qualified for licenses; and (4) Davis refused to license them. Put differently, they identify the specific right they sought to exercise, what they did to exercise it, who thwarted their efforts, and how she did so. Plaintiffs therefore adequately alleged the violation of a constitution right.

And that right was clearly established when Davis acted. To be clearly established, the right's contours must have been so obvious that a reasonable official would have known that her conduct was out of bounds. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This need for clarity means the Constitution's text, alone, is often insufficient to establish a right's edges; terms such as "liberty" and phrases such as "equal protection" are too general—too nebulous—to give an official the notice she needs. Constitutional law, then, regularly fills the void constitutional text creates. In other words, legal opinions that forge constitutional rights frequently set their limits as well.

Here, *Obergefell* both recognized the right to same-sex marriage and defined its contours. The Court's decree was as sweeping as it was unequivocal:

> [T]he right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that liberty. The Court now holds that same-sex couples may exercise the fundamental right to marry. No longer may this liberty be denied to them.

*Obergefell*, 135 S. Ct. at 2604–05. The Court made no mention of a limit on that right, of an exception to it, or of a multi-factor test for determining when an official violates it. For a

*reasonable* official, *Obergefell* left no uncertainty.  For Davis, however, the message apparently didn't get through.

And it still doesn't appear to have gotten through:  She now argues that *Obergefell* doesn't even apply to her conduct.  Because she stopped issuing licenses to all couples regardless of their sexual orientation, she claims, she "obviate[d] any equal protection issue."  That might be so, but the right to marry also arises from the Fourteenth Amendment's Due Process Clause. *Obergefell*, 135 S. Ct. at 2604 ("[T]he Equal Protection Clause, *like the Due Process Clause*, prohibits this unjustified infringement of the fundamental right to marry. . . . [U]nder the *Due Process* and Equal Protection Clauses of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that liberty.") (emphases added).  So one could say that Davis provided "equal protection of the laws," U.S. Const., amend. XIV, § 1, but in reality, her alleged conduct amounted to equal *deprivation* of the due-process right to marry.  Because *Obergefell* speaks to such deprivations, it applies with force here.

Davis further contends that *Obergefell* doesn't apply for another reason:  *Obergefell* involved a total ban on same-sex marriage, but here plaintiffs could've obtained marriage licenses elsewhere in Kentucky.  She also presents two other arguments with similar thrusts: (1) The relevant inquiry is whether Kentucky violated plaintiffs' right to marry, not whether she violated it, and (2) *Obergefell* didn't clearly establish a right to demand marriage licenses from particular state officials.  The common denominator is a claim that we should focus broadly on Kentucky instead of narrowly on Davis.  Yet Davis provides no legal authority for that proposition.  We can find none.  And we know why:  that's not how qualified immunity works, and that's not how constitutional rights work.

Qualified immunity protects government officials from lawsuits against them in their *individual* capacities.  *McCloud v. Testa*, 97 F.3d 1536, 1539 n.1 (6th Cir. 1996).  The focus of the analysis, then, is on what the law requires of them individually.  And nowhere in the Constitution—or in constitutional law, for that matter—does it say that a government official may infringe constitutional rights so long as another official might not have.  *All* government officials must respect *all* constitutional rights.  And that means *Obergefell*'s holding applies not

just to monolithic governmental entities like Kentucky but to the officials acting for those entities as well.

Davis also asks us to apply rational-basis scrutiny to plaintiffs' constitutional challenge. She says her actions were objectively reasonable because Kentucky's Religious Freedoms Restoration Act, Ky. Rev. Stat. § 446.350, required her to accommodate her personal religious opposition to same-sex marriage. This argument fails because, under *Obergefell*, the direct prohibition of same-sex marriage didn't trigger the tiers-of-scrutiny analysis typical in many other constitutional inquiries. "Rational basis" never appears in the *Obergefell* majority's opinion. Neither does "intermediate scrutiny." And "strict scrutiny" appears only once: in a reference to a Hawaii Supreme Court opinion during a discussion of how "[t]he ancient origins of marriage confirm its centrality" and how the concept "has not stood in isolation from developments in law and society." *Obergefell*, 135 S. Ct. at 2597.

On this point, the concurrence sees things differently. Although *Obergefell* never invoked the tiers of scrutiny, it reasons, the framework should still apply because Davis merely burdened the right to marry. Sometimes the government regulates marriage without banning it, the concurrence notes, and *Obergefell* didn't overrule that swath of caselaw. Thus, because plaintiffs could have obtained a license in another county and used it to wed within Rowan County, the argument goes, Davis didn't *ban* marriage. And because she didn't *ban* marriage, the argument continues, *Obergefell*'s method of analysis doesn't apply to her actions.

Yet *Obergefell* answered two questions, the first of which was "whether the Fourteenth Amendment requires a State to license a marriage between two people of the same sex." *Id.* at 2593. The Court said "yes." *Id.* at 2607. *Obergefell* therefore condemned the very action Davis took—refusing to license same-sex marriage—and did so without ever asking what government interest that refusal served or examining the relationship between the refusal and any proffered interest(s). This move "b[roke] sharply with decades of precedent." *Id.* at 2618–19 (Roberts, C.J., dissenting). *Obergefell*, then, didn't abolish the tiers of scrutiny for all marriage restrictions. But it did jettison them for actions such as Davis's.

Davis's request that we apply rational-basis scrutiny fails for a second reason as well. To be sure, *Obergefell* might have created "serious questions about religious liberty," 135 S. Ct. at 2625, (Roberts, C.J., dissenting), but it said nothing to suggest that government officials may flout the Constitution by enacting religious-based policies to accommodate their own religious beliefs. Davis provides no legal support for her contention that Kentucky's Religious Freedoms Restoration Act required her to do what she did. Her reading of the Act is a subjective one and, as far as we can tell, one no court has endorsed. In the presence of *Obergefell*'s clear mandate that "same-sex couples may exercise the fundamental right to marry," 135 S. Ct. at 2605, and in the absence of any legal authority to support her novel interpretation of Kentucky law, Davis should have known that *Obergefell* required her to issue marriage licenses to same-sex couples— even if she sought and eventually received an accommodation, whether by legislative amendment changing the marriage-license form or by judicial decree adopting her view of the interplay between the Constitution and Kentucky law.

In short, plaintiffs pleaded a violation of their right to marry: a right the Supreme Court clearly established in *Obergefell*. The district court therefore correctly denied qualified immunity to Davis.

## IV.

Finally, Davis argues that because plaintiffs haven't pleaded a violation of a constitutional right, the district court lacked subject-matter jurisdiction. As discussed above, plaintiffs have adequately pleaded a violation of their right to marry. More importantly, Davis conflates the merits of a claim with its source. Plaintiffs sued Davis under 42 U.S.C. § 1983. Section 1983 is a federal law. That means plaintiffs asserted claims "arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331. And district courts have original jurisdiction to resolve such claims. *Id.* Put differently, if a claim is ultimately unsuccessful, jurisdiction to resolve it doesn't vanish.

## V.

For these reasons, we affirm the district court's grant of sovereign immunity and denial of qualified immunity.

---

### CONCURRING IN PART AND IN THE JUDGMENT

---

JOHN K. BUSH, Circuit Judge, concurring in part and in the judgment. I concur fully in the Majority's treatment of the sovereign immunity issue. I also concur in the Majority's disposition of qualified immunity, though I follow a different route to that conclusion.

In the Majority's view, Kim Davis banned same-sex marriage in Rowan County plain and simple, and *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) abolished tiers of scrutiny in the analysis of bans on same-sex marriage. Therefore, the Majority does not apply tiers-of-scrutiny analysis to Davis's actions, which were per se unconstitutional under *Obergefell.* Davis is not entitled to qualified immunity because *Obergefell* clearly established that Davis's conduct was unconstitutional, and she may not rely on Kentucky's Religious Freedom Restoration Act ("KRFRA"), Ky. Rev. Stat. § 446.350.

I agree that Davis violated Plaintiffs' constitutional rights and is not entitled to qualified immunity. But, unlike the Majority, I don't find that Davis's actions constituted an outright ban of same-sex marriage, and I believe they should be reviewed using tiers-of-scrutiny analysis. Her conduct, however, does not survive even rational-basis review because of her anti-homosexual animus, which is not a legitimate basis for government action under *Romer v. Evans*, 517 U.S. 620, 632 (1996) and *Lawrence v. Texas*, 539 U.S. 558 (2003). *Romer*, *Lawrence,* and *Obergefell* together clearly established that Davis could not deny marriage licenses to Plaintiffs based on their sexual orientation; therefore, Davis was properly denied qualified immunity. I express no opinion on whether Davis may have been entitled to an exemption under KRFRA or what that exemption may have looked like because she never properly invoked the protections of the statute.

I.

There is no dispute that Davis, confronted by a conflict between her conscience and the dictates of *Obergefell*, ceased issuing marriage licenses in Rowan County. The Majority states that in doing so, Davis "depriv[ed] [Plaintiffs] of their right to marry." Majority Op. at 2.

According to the Majority, we must apply *Obergefell* to Davis's actions with the understanding that she effected a "total ban on same-sex marriage" within Rowan County.  Majority Op. at 9. The facts, however, are more nuanced than that.

The Commonwealth of Kentucky has two requirements for a valid marriage—licensure and solemnization:

> [T]he General Assembly intended two essential requisites of a legally valid civil marriage which are inviolable.  First, the parties intending to be married must obtain a marriage license from a county clerk.  Second, having obtained a marriage license, the parties intending to be married must solemnize their intent to be married before a person or society believed in good faith to possess authority to solemnize the marriage.

*Pinkhasov v. Petocz*, 331 S.W.3d 285, 294 (Ky. Ct. App. 2011).  It is true that Davis prevented Plaintiffs from acquiring marriage licenses in Rowan County.  However, a marriage license issued by any county clerk, in any county in Kentucky, is valid throughout the entire Commonwealth.  *See* Ky. Rev. Stat. § 402.080.  Thus, Davis did not (and could not) bar Plaintiffs from getting married in Rowan County.  Nothing prevented each Plaintiff couple from travelling outside Rowan County, obtaining a marriage license from a different county clerk, and returning to Rowan County to solemnize their marriage.

Plaintiffs do not dispute this, but they hypothesize that Davis's actions might have worked a total marriage ban upon a certain class of marriage license seekers, namely those Rowan County residents who could afford to travel to the Rowan County Courthouse but not to the courthouse of an adjacent county.  However, these hypothetical plaintiffs are not before us. In analyzing this issue, I would take Plaintiffs at their word: they were entitled to a marriage license but were prevented from getting one *in Rowan County*.  They suffered a hardship, to be sure.  What they did not suffer was a prohibition on getting married.

II.

Does this distinction make a difference? It may with regard to whether tiers-of-scrutiny analysis applies.  The Majority is correct that the *Obergefell* decision never uses the words "rational basis" or "intermediate scrutiny," and refers to "strict scrutiny" only once, in a non-

substantive manner. *See* Majority Op. at 10. But the fact that the Supreme Court held in *Obergefell* that a total ban of same-sex marriage was per se unconstitutional, does not necessarily mean that tiers-of-scrutiny analysis is inapplicable for review of a marriage regulation that is less than a total ban. I don't believe that the Supreme Court would abolish tiers-of-scrutiny analysis for all marriage regulations without explicitly telling us it was doing so. In any event, as we have noted, "the Supreme Court itself does not seem terribly bound by the rigid rules of tiering. The lower courts are bound, however, even though the Supreme Court remains free to create new levels of scrutiny or ignore old ones." *Montgomery v. Carr*, 101 F.3d 1117, 1123 (6th Cir. 1996).

I therefore believe we should apply tiers-of-scrutiny analysis to Davis's conduct. This naturally raises the question: what level of scrutiny should govern?

Even—especially—in the wake of *Obergefell*, there is some debate over the nature of the right to marriage under our Constitution. There are several lines of cases recognizing this right on different constitutional grounds. First, there is a substantive due process right to marriage. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 12 (1967) ("These statutes also deprive the Lovings of liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment. The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."). Second, there is an associational right to marriage. *See, e.g.*, *Roberts v. United States Jaycees*, 468 U.S. 609, 619–20 (1984) ("The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family[, such as] marriage . . . . [O]nly relationships with these sorts of qualities . . . have led to an understanding of freedom of association as an intrinsic element of personal liberty."). And third, as with any other state action, regulation of marriage will fall under the purview of the Equal Protection Clause of the Fourteenth Amendment to the extent that the state regulates different groups differently. *See Reed v. Reed*, 404 U.S. 71, 75–76 (1971) ("The Equal Protection Clause . . . den[ies] to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the object of the statute.").

In the contexts of substantive due process and associational rights, we analyze a marriage restriction through a two-step process: "first, a court must ask whether the policy or action is a direct or substantial interference with the right of marriage; second, if the policy or action is a direct and substantial interference with the right of marriage, apply strict scrutiny, otherwise apply rational basis scrutiny." *Montgomery*, 101 F.3d at 1124 (citing *Zablocki v. Redhail*, 434 U.S. 374, 383–84 (1978)). In the equal protection context, we analyze disparate treatment by the government this way: 1) we ask whether the restriction discriminates against a suspect or semi-suspect class, and 2) if it discriminates against a suspect class, we apply strict scrutiny; if it discriminates against a semi-suspect class, we apply intermediate scrutiny; if it discriminates against neither a suspect nor a semi-suspect class, we apply rational basis review. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988); *Loving*, 388 U.S. at 11.

Government may sometimes regulate marriage in ways that fall short of a complete ban, but that still place burdens on marriage rights. For example, in *Montgomery*, we considered a school district's policy that forbade employees from being married to fellow employees. *See* 101 F.3d at 1118. Two employees of the school district married each other, and because of the anti-nepotism policy, one of them was forced to take a job in a neighboring district. *Id.* at 1119. We held that forcing an individual to drive sixty-five miles per day as a condition of marriage was not a significant burden and applied rational basis to uphold the policy. *Id.* at 1121.

I do not read *Obergefell* as overruling cases like *Montgomery*. Aside from passing references to the Fourteenth Amendment, *Obergefell* did not spell out any new understandings of the sources of marriage rights under our Constitution, or when and how to apply which mode of analysis. *Obergefell* answered some questions, but it also left many unanswered.

This is not mere pedantry. A restriction on marriage could be examined in different ways, *possibly with different results*, depending on which analysis is used. For example, suppose that instead of refusing to issue marriage licenses on the basis of moral misgivings about same-sex marriage, the Rowan County clerk had gone on strike, and refused to issue marriage licenses to any applicants until Rowan County gave her a pay raise. Very likely, were we to analyze such a case under equal protection, we would not find a constitutional violation, because there would simply not be disparate treatment of anyone. *See Scarbrough v. Morgan Cty. Bd. of Educ.*,

470 F.3d 250, 260 (6th Cir. 2006) (explaining that "[t]he threshold element of an equal protection claim is disparate treatment"). On the other hand, if we were to analyze such a case as a substantive due process violation, we might find a constitutional violation. Even if we agreed that the refusal of one county—out of 120 in Kentucky—to issue marriage licenses was not a significant interference with the right to marriage (and thus applied rational basis review), it is hard to imagine that we would construe a county clerk's desire for a pay raise as a legitimate government interest to justify the non-issuance of marriage licenses.

The present case, as the Majority points out, is relatively easy. Not because, as the Majority holds, the case does not require us to discern and apply an appropriate level of scrutiny. Instead, this case is straightforward because even if we give Davis the benefit of any doubt and apply the lowest tier of scrutiny, rational basis review, the result is still the same. The next marriage-regulation case that our court hears may not be amenable to this type of judicial shortcut.

Let's assume arguendo—either because Davis's actions were not a significant interference with Plaintiffs' right to marriage, or because her actions were not discriminatory against a suspect or semi-suspect class—that rational basis is the appropriate level of scrutiny. Under rational basis review, state activity is constitutional if it is rationally related to a legitimate purpose. *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 694 (6th Cir. 2014). "There is a strong presumption of constitutionality and the regulation will be upheld so long as its goal is permissible and the means by which it is designed to achieve that goal are rational." *Id.* To conclude that the governmental action in question fails rational basis review, we must find that "government action . . . 'is so unrelated to the achievement of any combination of legitimate purposes . . . that the government's actions were irrational.'" *Michael v. Ghee*, 498 F.3d 372, 379 (6th Cir. 2007) (quoting *Club Italia Soccer & Sports Org. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006)).

Although rational basis is the lowest level of scrutiny, there are some instances in which government action does not pass even that low bar. Under *Romer v. Evans*, government actions based on moral disapproval of homosexuality fail rational basis review. *See* 517 U.S. at 632. Similarly, in *Lawrence v. Texas*, the Supreme Court indicated that moral disapproval on the part

of the state legislature was not a "legitimate state interest" justifying interference with homosexual relationships.  539 U.S. 558, 578 (2003).  Likewise, county clerks are not allowed to act on this basis.  *Cf. Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978) ("[L]ocal governments, like every other § 1983 'person,' . . . may be sued for constitutional deprivations . . . .").

Davis argues, however, that she was entitled to an accommodation under KRFRA, or at least had a good-faith basis to argue for such an accommodation, that would entitle her to qualified immunity, notwithstanding the federal constitutional mandates of *Romer, Lawrence*, and *Obergefell*.  However, it is not settled whether KRFRA actually entitled Davis to an accommodation.[1]  KRFRA provides, in relevant part:

> The right to act or refuse to act in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest.

Ky. Rev. Stat. § 446.350.  Based on this language, Davis not only argues that she was entitled to an accommodation but also takes the argument even further: she claims she was entitled to *self-*create an accommodation if none was forthcoming from the state government.  The latter point, it seems to me, goes too far.

Even if we assume arguendo that KRFRA entitled her to an accommodation,[2] it was not permissible for Davis to take the law into her own hands.  Her "accommodation"—refusing to issue any marriage license to any applicant—denied Plaintiffs marriage licenses in Rowan County to which they were entitled, given the existing state statutory framework and the holding of *Obergefell.*  Davis is correct that *Obergefell* neither spelled out the entire nature of marriage rights under our Constitution nor spelled out a comprehensive analysis for constitutional review of restrictions on marriage rights.  She also correctly notes that the *Obergefell* majority and

---

[1]I note here that the constitutionality of KRFRA is not at issue in this case.

[2]This assumption is not necessarily true.  My research could not find a Kentucky case interpreting KRFRA to support the theory that a government employee may be relieved from the performance of ministerial duties under the auspices of the statute.  However, for the purposes of this concurrence, I assume without purporting to decide that Davis's theory of KRFRA is correct.

dissent agreed that the holding was not meant to denigrate religious faith or people who hold moral viewpoints in opposition to same-sex marriage. *See Obergefell*, 135 S. Ct. at 2607; *id.* at 2625 (Roberts, C.J., dissenting).  However, whatever unclarity, whatever unresolved tension, whatever lingering questions remain in the wake of *Obergefell*, one thing is clear from that decision: "Today . . . the Court takes the extraordinary step of ordering every State to license and recognize same-sex marriage." *Id.* at 2611 (Roberts, C.J., dissenting).  Although I cannot agree with the Majority's statement that "*Obergefell* left *no* uncertainty," Majority Op. at 9 (emphasis added), I agree that Davis knew or ought to have known, to a legal certainty, that she could not refuse to issue marriage licenses, as was her duty under state law, because of moral disapproval of homosexuality.  And if Davis truly believed that she had a right under KRFRA to not issue marriage licenses, she should have sought and obtained judicial confirmation of her claim.  That, she did not do.

I therefore agree with the Majority that Plaintiffs have pleaded a violation of their constitutional right to marriage based on Davis's refusal to issue marriage licenses and that the district court correctly denied qualified immunity to Davis because she violated clearly established rights.